## FLOYD UPCHURCH v. STATE.

No. A-9025.  Aug. 28, 1936.
(60 Pac. [2d] 395.)

J. R. Charlton and Chas. W. Pennel, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, J. Appellant, Floyd Upchurch, was convicted in the district court of Washington county of the crime of manslaughter in the first degree and his punishment assessed at 12 years' imprisonment in the state penitentiary.

The information in substance charged that in said county on or about the 8th day of February, 1935, Floyd Upchurch, the defendant, did willfully, unlawfully, and feloniously make an assault upon one Harry Payne with a club about three inches in diameter and two feet long, with the premeditated design to effect the death of said Payne, and did then and there strike and beat the head and face of said Payne, thereby inflicting certain mortal

wounds with the felonious intent on the part of him the said Floyd Upchurch to kill and murder the said Harry Payne.

From the judgment rendered June 29, 1935, in conformity with the verdict of the jury, he appeals.

The only errors assigned are that the evidence is not sufficient to sustain the verdict, and that the court erred in not granting a new trial.

A substantial statement of the evidence is as follows:

Elbert Kester testified that he lived in Bartlesville; was acquainted with Harry Payne in his lifetime and the place he lived, on the south side of First street, between Rogers and Morton; that about 8:30 on the morning of February 8th, he saw smoke coming out from under the roof of the house where Harry Payne lived; that with Frank Vanley he went to the house, entered the back door, and saw the body of a man lying on the floor in the front room, and a blaze of fire about a foot high around the body; that he poured water on the body to put the fire out, and then took hold of the man's feet and started to drag him out, and found that the body was stiff; that he told Vanley to call the fire department. The front door was locked, and the back room was full of salvage and junk. The fire department got there and put out the fire about 9 o'clock. There was blood on the floor and blood spots on the ceiling. A club or stick was lying on the floor near the dead man's hand and a five-gallon can was on the floor near the body. That he knew Harry Payne, the deceased, in his lifetime, and knew him to be badly crippled in both feet and one hand was crippled.

G. H. Glessner testified that he lived at 210 South Bucy, Bartlesville, his house being one block west and

one block south of where Harry Payne lived; that the day before Payne was found dead, he was passing the house and heard loud talking in there; that he went in, and Floyd Upchurch, sometimes called "Red," was there. He asked them, "What's going on in here?" Payne said: "Nothing much. Have you got any money?" He said, "I think I have 35 cents." Payne said: "I want to borrow it." And he gave it to him. Payne went out and came back in about an hour with some whisky. Upchurch and Payne drank the whisky, except that witness took one drink with them; that Payne slapped witness on the side of the head, and Upchurch spoke up and said: "Harry, I would not do that, somebody is liable to tear your head off by doing stuff like that." Payne called Upchurch a bad name, and Upchurch said, "Don't call me no redheaded son of a bitch, if you do I will tear your damn head off." That Upchurch had a stick of wood in his hand about 16 inches long, looked like it had been sawed with a buzz saw. Witness took hold of the stick, and Upchurch threw it down by the stove. That Upchurch and Payne had another scuffle before he left there about noon; that he saw the same stick there the next morning on the floor in front of Harry Payne's face; that the stick had blood on it. That he saw Upchurch and Payne again about 2 or 3 o'clock in the afternoon of that day and they were intoxicated; that when he arrived at Payne's house the next morning one of the Kestler boys and one of the Vanley boys were there; that Harry Payne, the deceased, was about 55 years old.

William Peyton testified that he lived on the west side of the block and Harry Payne lived middleway of the south side; that the day before Harry Payne was found dead, he saw him with Floyd Upchurch, and they were cranking a Ford truck that belonged to Mr. Payne;

it was raining that day; that he saw them again that afternoon and saw Upchurch late that evening standing in the front door of Harry Payne's place.

Lyle Fernald testified that he was carrying a paper route and saw Red Upchurch and Harry Payne about 6 o'clock at night February 7th; they were on Cudahy street, between Blythe and Cass; they were trying to get their car started; that they were drinking; that Harry asked him to take a drink and to crank his Ford, and he tried to crank it and it kicked back, so he left them.

Francis Wine testified that he saw Harry Payne and Floyd Upchurch trying to get the car started about 6 o'clock in the evening; one said they could get the car started and the other said they could not; and then Upchurch left, and about ten minutes later Harry left and took some groceries with him.

Mrs. Blalock testified that she lived a couple of blocks west and a block north of Harry Payne's place; that a few minutes before 9 o'clock that night she saw Harry Payne with another man; they were quarreling about a truck that was stuck below her house; it had been stuck there since about dusk; they were cursing one another; and when they walked away one was carrying a five-gallon gasoline can.

James Conway testified that:

"I live in Dewey, I was acquainted with Harry Payne during his life time and I know Red Upchurch. They came to my house a few days before Payne was killed to buy some junk. The old man was driving the car. Upchurch said, 'You see that damn son of a bitch?' I said, 'Oh, you ought not to call that old man that.' Upchurch said, 'He has got some money, I am going to get it.' I said, 'You ought to be ashamed of yourself.' He said, 'I will get it, I will kill that damn son of a bitch.' I

turned my back and he said, 'Looks like you is chicken-hearted.' I said, 'Listen, let me tell you one thing, white folks' business is their business, my business is my business.' "

Dr. John P. Torrey testified he was a physician and surgeon; graduate of Harvard University; practicing his profession at Bartlesville; performed an autopsy on the body of Harry Payne; found the body badly burned; the left ankle was burned more than the right ankle; found four wounds on the head, one on the hair line of the forehead about an inch long, one at the top of the head, about an inch and a half long, one on the left side, and one on the back of the head; the bones of the skull were crushed into many pieces, showing great violence must have been used in causing the fractures.

Jim Knisley, deputy sheriff, testified he went to Harry Payne's place, the fire department was there, and saw the body of Harry Payne; that he picked up a club from the floor near the body, about 16 inches long, two and one half inches in diameter, and he produced the club; that he arrested Floyd Upchurch about noon that day and brought him to the sheriff's office; they found blood spots on his clothes. He produced the clothing worn by the defendant at the time of his arrest to show that the blood spots were still visible.

J. D. Engle, undersheriff, testified when the defendant was brought to the jail, they asked him to take off his coat and hat and his trousers; that they examined the clothes and found blood spots; they found blood spots on the underside of his hat, and blood spots were found on the coat and on the coat sleeves, and found blood spots on the pants. The clothes were indentified and introduced in evidence.

For the defense, W. J. Holmes testified that the defendant came. to his home about 5 or 5:30 on the morning of the 8th day of February, 1935, had breakfast there, and remained until about noon that day, when they went down town, and Jim Knisley arrested the defendant, that his home is six or seven blocks from where Harry Payne lived.

Mrs. W. J. Holmes testified that she had known the defendant for about eighteen years; that she heard somebody rap the back door that morning and asked who is it, and the defendant answered, "Red Upchurch." She called her husband, and he went to the door and let him in.

Clarence Stephens testified that he called at the Holmes' home that morning at 8 o'clock and there talked with the defendant.

Three witnesses testified that they had seen Harry Payne around his premises that morning before the fire.

Mrs. Emily Morris testified:

"I saw Harry Payne that morning exactly at 7:30, the whistle was blowing, I am old and I could be mistaken possibly, but I saw what I really supposed at that time to be Mr. Harry Payne coming out of the west door, as I have seen him do many times before."

Two little boys testified that they had been selling Harry Payne junk and went to his house that morning to sell him some bottles and used tires, and they testified there was some one in the house at that time; that the man they saw was not the defendant.

Other witnesses testified that for several years Harry Payne and the defendant Floyd Upchurch had been good friends; that they worked together, slept and drank together.

As a witness in his own behalf, the defendant testified that he had known Harry Payne two or three years, and he helped him in his work, hauling junk and work of that kind; that on the morning of February 6th he met Payne downtown and he asked him to help him haul some wood for the Salvation Army; that he got on his truck, an old Ford model, and helped him haul wood that day and stayed at his house that night; that February 7th was a drizzly day, and they worked on the truck the biggest part of the day and hauled one load of wood; that evening about 7 o'clock the truck slipped off on the side of the road; he would judge it was about 12 o'clock that night when Mr. Payne went after the gas; that when leaving he said: "You stay with the truck to keep somebody from stripping it." That he never did see him anymore; that it started raining and he got under the truck and stayed until he got cold, then went to Jack Holmes' place; that he would judge it was about 5 o'clock when he reached the Holmes' place; that he ate breakfast there and went downtown with Mr. Holmes just before noon and was arrested, and has been in jail ever since, a trusty most of the time; that he was convicted of grand larceny in Kansas, paroled after the first year, and was later pardoned. He denied any knowledge or any connection with the homicide; that at the time of his arrest he was wearing a light colored suit; and if there were blood on his clothing, he explained that could have happened because the clothing had been worn by his father when he was butchering, and that he had picked up a boy called Bill McCoy down by the railroad who had fallen on some rocks that made his nose bleed. That this happened February 5th, and maybe the blood from this boy's nose got on his clothes.

The foregoing substantially states both the state's and the defendant's theory of this case.

The record shows that when the state rested a demurrer to the evidence was interposed and counsel for the defendant moved the court to advise the jury to return a verdict of not guilty, and at the close of all the testimony in the case, the motion for directed verdict of acquittal was renewed and again overruled.

It is the contention of the defendant in this court and in the lower court that the evidence was not sufficient to sustain a conviction, in that the testimony supporting the alibi defense interposed is undisputed and that there was no testimony tending to show motive to commit the crime.

Where the evidence is circumstantial and the circumstances are such as to reasonably justify the inference of guilt, the weight and value of such testimony are exclusively for the jury. It is only where the evidence does not obviously warrant the inference of guilt that this court will interfere; otherwise the weight of circumstantial evidence and the inference to be drawn from it, in almost every case, would finally be determined by the appellate court.

This court has repeatedly held that all that is required of the appellate court in determining the sufficiency of the evidence to support a conviction is to find that there is evidence in the record which forms a sufficient basis for the verdict of the jury. The credibility of the testimony of the witnesses testifying on the part of the defendant is the exclusive province of the jury to determine, and, although such testimony may be uncontradicted and not directly impeached, when there are facts and circumstances in evidence tending to lessen the prob-

ability that such testimony is true, the jury may give it such weight as they deem proper, even to the extent of wholly disregarding the same. Scott v. State, 59 Okla. Cr. 231, 57 Pac. (2d) 639.

The existence of a motive for the commission of a crime is not indispensable to a conviction, but proof of motive is always competent against the defendant. Motive is but a circumstance, and the existence or nonexistence of motive is immaterial where the guilt of the defendant is clearly established.

Upon a careful consideration of the record, we are of opinion that this conviction was justified by the facts and circumstances in evidence, and any other verdict than the one returned would have been against the weight of the evidence. The jury had the witnesses before them and could see their manner of testifying, and they no doubt, in determining the truth, took into consideration all the attending circumstances of the case.

It is our conclusion, after a careful examination of the entire record, that the defendant had a fair and impartial trial, and that his conviction is sustained by the evidence.

The judgment is therefore affirmed.

EDWARDS, P. J., and DAVENPORT, J., concur.