Ida Belle DENNEY, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12743.

Court of Criminal Appeals of Oklahoma.

Oct. 28, 1959.

Thomas Dee Frasier, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Ida Belle Denney, hereinafter referred to as defendant, was charged by information filed in the district court of Tulsa County with the crime of murder. Specifically, she was charged with the murder of Betty Jane Watkins by shooting her by use of a pistol. Defendant was tried before a jury, convicted and her punishment fixed at life imprisonment in the State Penitentiary at McAlester.

For reversal of the conviction, counsel advances some five specifications of error.

It is first and lastly urged that the evidence was insufficient to support the conviction. The State used some eleven witnesses. A demurrer was interposed to the State's evidence upon the ground of its insufficiency, and the demurrer was overruled. The defendant stood on the demurrer, and offered no evidence. A summary of the testimony is required.

Ruby Deatherage testified that she lived at 3010 North Frankfort Place, Tulsa, on April 1, 1958. That she was the mother of Betty Jane Watkins, the victim, who was 26 years of age at the time of her death. She said that her daughter on the date mentioned lived at 3008 North Frankfort Place, in plain sight of the home of witness, there being two vacant lots between the homes of mother and daughter. Witness stated that Betty Jane had two sons, six and eight years of age, who lived with their father, who was divorced from her daughter. She said that she had known the defendant, who lived about a block and a half from her home, for around eight years, but her deceased daughter had been acquainted with defendant ever since the

daughter was about fourteen years of age. Defendant and Betty Jane were good friends, and defendant had a key to Betty Jane's home.

Witness testified that on the afternoon of April 1, 1958 her daughter, Betty Jane Watkins, driving her 1956 Pontiac came by the home of witness to take witness to pick up an ice crisper a friend had borrowed, but that they first drove to Ida Belle Denney's home. This was about 3 o'clock in the afternoon. Betty Jane was returning a sweeper, hat and purse to defendant, took them into Ida Belle's home, and then Ida Belle came out to the car with Betty Jane, and in conversation said that she had stayed all night with Miss Fry the night before, and said: "Betty Jane, can I stay all night with you tonight?" and Betty Jane answered her, "I guess so". That then Betty Jane asked defendant if she wanted to go with her to pick up the ice crisper, and she said that she did. After this her daughter let witness out at her home. Later Betty Jane and Ida Belle came by the home of witness, about 6:30 or 7 P.M., and Bob, a son of witness, was there. She said that defendant had on a black coat and brown loafer shoes, and held a blue house-coat or dress on her arm. Witness identified the dress and coat, which were received in evidence over the objection of defendant. She said the items were clean when she saw them in possession of defendant, but described them as being dirty at time of trial.

Witness further testified that her daughter and defendant left together in Betty Jane's car to go to Betty Jane's home by way of the nearby drug store, where they wanted to purchase cigarettes. Later, about 9 o'clock that night, witness noticed Betty Jane's car parked in front of her home.

The next morning, April 2, 1958, about 8:45 she noticed her daughter's car still parked in front of the house, which caused witness some concern because the daughter was supposed to be at work at that time. Witness tried to telephone her daughter, but received no answer. She then telephoned defendant's number, and no one answered. Witness then went to her daughter' home, pounded on the front door, the windows and then the back door, but got no response. The house was locked and she could not get in. She then went west across the alley to where her son Bill lived and got him to try to get in Betty Jane's house. He finally was able to get a north window in the kitchen open. He then came to a back window, and following this witness went on to her home.

W. L. "Bill" Deatherage, son of Ruby Deatherage and brother of Betty Jane Watkins, testified that he lived at 3007 North Frankfort, and that on April 2, 1958 he lived one block directly west of Betty Jane's home. That on April 2, 1959 at about 9 A.M. his mother came to his home and he went with his mother to his sister's home. That he tried the back and front doors, but they were locked, and he finally prized up a kitchen window and entered the house and went to his sister's bed room. She was in the bed, completely covered, and he pulled back the bed covers and found that his sister was dead. He covered her up again, called out of the window for his mother to go on home, and went out and asked a neighbor to call the police. He said that no one entered the house prior to arrival of the police.

Billy Harper, police officer, arrived at 3008 North Frankfort Place, Tulsa, at 9:21 A.M. on April 2, 1958. He found Betty Jane Watkins dead in her bed. He found parts of a bullet on the floor and a bullet in the east wall two feet seven inches from the floor, found blood spots, etc. He said Sgt. Ralph Phillips and officer Pete Annex were also in the room; that the victim was completely covered with a blanket, sheet and a spread. He made a diagram of the rooms and furniture arrangement, etc. He discovered two bullet slugs in the mattress, and what appeared to be bullet holes in the bed clothing. The house was tidy and in order. The windows were fastened down. The victim's jaw was fractured; there was a hole in the side of her face and lacerations and apparent powder burns.

Witness said that he was in charge of the investigation until officer Jack Purdie arrived, about ten minutes after his arrival.

Officer Pete Annex said that when he and Sgt. Phillips found that there was a dead body under the covers, they went to the police car and called for the officers handling homicide cases.

James R. Bivens testified that on April 2, 1958 he was assigned to the homicide division in the Tulsa Police Department, and got a call to go to 3008 North Frankfort Place, and arrived six minutes before ten in the morning; that when he arrived Inspector Purdie, Chief McGuire, Sgt. Ray Jones, and Corp. Billy Harper were present. He saw certain photographs made and identified State's exhibit No. 4 as a picture accurately portraying the position and condition of the body of Mrs. Watkins in bed at the time the officers were in the home. The covers had been removed. He identified other pictures showing scenes in the bed room, and said Sgt. Ray Jones made the pictures. He said the pictures accurately depicted the scene. From the pictures there was no evidence of a struggle either in the bed, the room or the house. There was evidence of bullets in a wall and a dresser drawer and in bed clothing and the night gown worn by Mrs. Watkins. Witness recovered certain bullets and two fragments, all of which were sent to the Federal Bureau of Investigation, Washington, D. C., for examination. He identified the bullets and fragments which were received in evidence. Witness found an empty .32 calibre American H & R revolver in a hall closet, but there was no indication of recent firing.

Dr. Leo Lowbeer, pathologist, testified that he saw the body of Betty Jane Watkins on April 2, 1958 and performed a post mortem examination on the body, inside and out, and that the examination revealed six bullet wounds. He found a point of entrance of one bullet over the left cheek, which shattered the right jaw bone. There were powder burns at point of entrance. The second wound of entrance was over the middle of the chin. The bullet travelled

from left to right, as did all of the bullets. Another bullet entered on the right breast underneath the nipple, and another in the lower left chest wall and the exit was the right flank. Wound number five was the fatal wound. The bullet travelled through the aorta and hit the spinal column and was found in the spinal canal completely deformed. The sixth wound entered the left chest wall below the others. Witness found no defense marks on the body, no indication of a struggle.

Ray Jones of the Tulsa Police Department Bureau of Identification and Crime Laboratory, testified and identified certain pictures made of deceased and the rooms in her house on April 2, 1958. He testified to finding a cigarette butt on the window sill on the south side of the room. A picture showed the location with reference to the bed. He testified to recovering certain bullets and sending them to the F. B. I. in Washington for examination.

Richard J. Poppleton of the F. B. I. laboratory, Washington, D. C., testified to having examined certain bullets admitted into evidence, and previously shown to have been shot into the body of Mrs. Watkins. He said there were seven in all, but two being mere fragments, previously shown to have been shattered by hitting bones in deceased's body. It was the opinion of witness that the five intact bullets that showed grooves were calibre .38 special bullets. He detailed scientific reasons.

Peter G. Duncan by agreement of the parties had testified the first day of trial and departed to testify in another court. He identified a blue housecoat, shown to have been in defendant's possession the evening of April 1, 1958 and found on her when she was taken into custody by officers on April 6, 1958. He said that he recovered the coat from the Tulsa Police Department and examined it for blood stains, and found what he determined to be blood near the right side pocket of the coat.

John Forbes of the Tulsa Police Department testified that on the morning of April

6, 1958 about 10:30 he drove to 3008 Garrison Place, Tulsa, and found a woman on the front porch lying face down, and identified the woman as being the defendant. He said that defendant had on a black wool coat and a light blue cotton house dress, and he identified these items, which had been received in evidence.

Witness said that he asked the defendant if he could help her, and she said "yes", that she wanted a drink of water. He assisted defendant to her feet and they got in the police car and drove to a police station at Fourth and Elgin, Tulsa. Said witness: "I asked Mrs. Denney if she had a friend named Betty. She said yes, that she had did a terrible thing. That's all that was said." Witness further testified that he took defendant to a water fountain and after she drank he took her to the police chief's office.

Witness on cross-examination as to defendant's physical condition described her as outwardly being dirty and that her hair was matted and not combed. Witness said that he was on patrol duty when he found defendant flat on her face.

Officer Jack Purdie testified that on the morning of April 6, 1958 between 10:30 and 11 A.M. he saw the defendant at the Tulsa Police Department in the chief's office, and had a conversation with her. Said he:

"I asked Mrs. Denney where she had been for the past four or five days. She stated that she had just awakened, she didn't know. I questioned her as to whether or not she owned a gun. She said she did. I asked her what kind, she said she did not remember, but it was a .38 that her brother had given to her last summer.

"Q. Did she tell you her brother's name? A. Yes, she did.

"Q. What did she say his name was? A. Ray Fleming.

"Q. Was there anything said about where Ray bought the gun? A. Yes, sir.

"Q. What did she tell you? A. At Dick Bardon's.

"Q. Go ahead, Jack. A. I asked her where the gun was and she said she did not know. I asked her if she could tell me what had happened the night of the 1st or early morning of the 2nd. She first told me that there was a man in the bed. She woke up and he was shooting and she started shooting. She then stated that she heard some noise and Betty had told her that it was a rat. She then told me that she wakened when she heard somebody screaming and she started shooting.

"Q. Did she tell you where she got the gun? A. I asked her where she got her gun, she said it was underneath the pillow; that she always kept it underneath the pollow. She had a gun and Betty had a gun.

"Q. Did you find another gun in the house? A. We did.

"Q. And where did you find it? A. Officer Bivens found it in the clothes closet."

He further testified:

"A. I asked Mrs. Denney if she wanted me to call Mr. Page. She told me no, she didn't.

"Q. Who is Mr. Page? A. Her attorney at that time. She told me after she did the shooting that she ran out of the house; that she had heard a door slam; that she didn't know where she had gone to, but she did not go to her home, and that she had fallen in a ditch while she was running. She told me she didn't know where she had been since that time until she awakened.

"Q. Did you have any conversation with her, Jack, pertaining to what happened prior to the shooting, what they were doing earlier in the evening? A. Yes, I asked Mrs. Denney where they had been, told me that she and Betty had gone to Musick Drug Store

where Betty purchased two packages of cigarettes; a package of Herbert Tareytons and a package of Luckies for Mrs. Denney; that she did not go in the drug store, she stayed in the car.

"Q. Did she tell you where they went from the drug store? A. They went directly back to Betty's home.

"Q. Was anything said about what happened or what they did after they returned home? A. Said something about Betty had rolled her hair and she had ironed a housecoat.

"Q. Was anything said about when they went to bed or who went to bed first? * * * A. I don't recall, Mr. Simms.

"Q. Did she tell you anything, Jack, pertaining to what she done immediately after firing the shots and before she ran out of the house? * * * A. No, except that she had run out of the house, heard a door slam; she was afraid somebody was chasing her.

"Q. Jack, did she ever explain to you where she had been those four days? A. Said she could not remember except that she did not go to her own home.

"Q. Did she ever tell you what happened to the gun? A. No, sir.

"Q. Was there a search made for that gun? A. Yes, sir.

"Q. Can you tell of what that search consisted? A. It consisted of about a week and a half's work by the sheriff's office, men from the police department, investigators from the county attorney's office with the assistance of some Army personnel with my detectives.

"Q. Has that gun to this date been found? A. It has not.

"Q. Do you know what was done with Mrs. Denney after you finished the conversation there at the police department? A. Yes, sir.

"Q. What was done? A. I took her to Hillcrest Hospital with Officer Harper.

"Q. Why did you take her to Hillcrest? A. It was on recommendation of Mr. Edmondson."

Officer Purdie also testified to finding a cigarette butt and burnt match on the window sill beside the bed, and also an ash tray on a chest or hamper with a number of cigarette butts in the tray.

Roy Essley testified that he was employed at Bardon's sporting goods store, 107–109 South Main, Tulsa, and identified State's Exhibit 24 as a record from his firm, being application to purchase a dangerous weapon. It was dated June 15, 1957 and signed "Ray Fleming". He said that Fleming purchased two guns, one a Colt Police Positive Special, with four inch barrel, and one a Colt Detective Special, with a two inch barrel. The applicant's finger prints were also on the application.

From the above condensed summary of over two hundred pages of evidence, we see that the evidence was not entirely circumstantial, and for such reason the many cases cited by counsel as to the sufficiency of the evidence are not in point. It is true that no motive for the murder was shown.[1] The evidence does show that defendant and deceased were to spend the night together in deceased's home and left for the drug store to get some cigarettes and later the car they were in was seen parked in front of deceased's home. Defendant had a key to deceased's home. She wore a black coat and had a blue house dress on an arm when she left for de-

---

1. No issue has been raised on this point. But it might be well to say that the court gave a proper instruction covering the situation presented by the evidence as to motive. It is generally held that motive is not an essential element of murder and need not be proved to sustain a con-
viction. See 41 C.J.S. Homicide § 318, p. 31; 22 C.J.S. Criminal Law § 31, p. 89; 40 C.J.S. Homicide § 227; Upchurch v. State, 59 Okl.Cr. 412, 60 P.2d 395; Collins v. State, 15 Okl.Cr. 96, 175 P. 124; State v. Tuttle, 58 Ariz. 116, 118 P.2d 88.

ceased's home. The murder was deliberate and premeditated as there was no evidence of a struggle and the six shots were from right to left in the body, indicating that the person doing the shooting was either lying on the bed with deceased, or standing at the side with the first bullet rendering deceased immobile.

The defendant could not be located until four days after the discovery of the death of her friend; and at that time she had on the black coat and the blue house dress, and her appearance indicated that she had been in hiding. She said when asked about deceased, "Yes, and I did a terrible thing." She admitted that she had a pistol under her pillow in the deceased's bed the night of the murder. She admitted shooting, but said it was at a man who was in the bed and was also shooting. That would have made three in the bed and the bed room could have been expected to be in disorder. It was corroborated that defendant did own a .38 Colt Special pistol, and that the five bullets entering deceased's body were .38 Specials, and one split into two parts on hitting bone structure and it was impossible to say definitely what calibre bullet it was.

■ The evidence recited was sufficient to go to the jury, and the jury was entitled, guided by the instructions of the court, to determine the facts. The defendant was not entitled to an instruction covering circumstantial evidence. Littke v. State, 97 Okl.Cr. 78, 258 P.2d 211, but the giving of such instruction by the court was favorable to the defendant, and affords her no ground for complaint

■ This Court has many times said that it will not interfere with the verdict of a jury on the ground that the evidence is insufficient to sustain the conviction, unless the record affirmatively discloses that there was no competent evidence in the record upon which the verdict could be based. Lincoln v. State, 86 Okl.Cr. 415, 193 P.2d 618; Sheehan v. State, 83 Okl. Cr. 41, 172 P.2d 809; King v. State, Okl.

Cr., 305 P.2d 589; Dobbins v. State, Okl. Cr., 268 P.2d 307.

■ The complaint by counsel that the prosecution was guilty of reprehensible conduct in questioning Dr. Lowbeer with reference to the absence of "defense wounds" on deceased is not tenable in view of the statement of the defendant to the officers of what happened the night that deceased met her death. And complaint of the introduction of State's Exhibit 24, being the record of the purchase of a pistol by defendant's brother, corroborated her statement to the officers that her brother purchased her a .38 calibre Colt Special revolver, and that being the type used in the killing.

■■ Complaint is made as to the argument of the prosecution. The argument of both Mr. Crossland and Mr. Simms is shown in the record, and we have made a close study of it with reference to the record. We have also studied the argument of defense counsel. We find no discrepencies sufficient to amount to reversible error.

Counsel particularly objects to the statement of the county attorney where he said:

"Let me tell you that everything I said here today and everything that's been produced from this witness stand as of this moment must for all time stand uncontradicted. There's not one word of controversy on the other side about what happened."

It is argued that this constituted a comment upon the failure of the defendant to testify. We note that no objection was made or exceptions reserved as to the statement complained of. But statements similar to the above have many times been considered by this Court. In Chesser v. State, 63 Okl.Cr. 84, 73 P.2d 191, 192, Doyle, J., speaking for this Court, said:

"Statements of the prosecuting attorney, in argument to the jury, 'Why couldn't they contradict the state's testimony, but not one place do they do that,' and, 'I say again there is no evi-

dence offered to contradict the state's evidence in this case' held not a comment upon the failure of the defendant to testify as a witness in his own behalf, within the meaning of section 3068, St.1931 (22 Okl.St.Ann. § 701)".

See also Lakes v. State, 61 Okl.Cr. 252, 67 P.2d 457; Presnell v. State, 71 Okl.Cr. 162, 109 P.2d 834; Bush v. State, 91 Okl. Cr. 30, 215 P.2d 577; Clark v. State, 91 Okl.Cr. 210, 218 P.2d 410; Taylor v. State, 96 Okl.Cr. 188, 251 P.2d 523.

■ It is argued that the court committed error in giving Instruction No. 11½, relating to flight. This Court in Wilson v. State, 96 Okl.Cr. 137, 250 P.2d 72, a case where defendant denied flight, and introduced evidence in explanation, there approved an instruction covering flight as applicable to a case of that kind. It was also suggested that the trial court before giving such instruction should define flight. The court did not do that in this case, but our attention has not been called to a case, and we know of none from this Court, holding that such failure would constitute reversible error.

In the present case, the evidence of flight was partially circumstantial together with the statements made by the defendant to officers concerning her departure from the deceased's house, which was tantamount to a confession of flight. The question for the jury to decide was whether the admitted flight was for the purpose of evading apprehension and being charged with a crime, or merely to escape a pursuer. There was no evidence to contradict her statement that she did flee the home of deceased. So the court gave the following instruction:

"No. 11½. You are instructed that evidence has been offered tending to show flight by the defendant shortly after the commission of the crime alleged against her in the information. If you find from the evidence beyond a reasonable doubt that the defendant did at some time flee from the place of the shooting and that such flight was induced by her apprehension of being charged with a public offense by reason of the shooting of Betty Jane Watkins, this is a circumstance which may be considered by you, in connection with all of the other evidence to aid you in determining the question of her guilt or innocence. (Excepted to by the defendant.)"

It will be noted that the court stated that there was some evidence tending to show flight. Of course if there was no such evidence the court would be under no obligation to give such instruction, and to give it would be improper. Under the facts of the case the court submitted to the jury the question as to whether or not the evidence was sufficient to convince the jury beyond a reasonable doubt that the defendant fled, and to determine why. The instruction given does not, considering the facts in the two cases, conflict with the suggested instruction in Wilson v. State, supra.

Counsel at the time was asked by the court on two different occasions to submit any additional instructions which he desired the court to give. It was counsel's duty to call attention to any apparent defects, and submit different instructions to the court. This he did not do.

A careful reading of the entire record reveals no errors such as would entitle defendant to a reversal of the case. The verdict, and the judgment and sentence complained of must be, and are affirmed.

NIX and BRETT, JJ., concur.