**Tom Lester PUGH, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–73–29.**

Court of Criminal Appeals of Oklahoma.

Nov. 14, 1974.

Joe A. Moore, Memphis, Tenn., George G. Briggs, Pawhuska, for appellant.

Larry Derryberry, Atty. Gen., Bill James, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

The appellant, Tom Lester Pugh, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Tulsa County of the crime of Murder. The jury returned a verdict of guilty and assessed punishment at life imprisonment in the state penitentiary. From such judgment and sentence the defendant has perfected his timely appeal.

Briefly stated, the evidence adduced at trial is as follows: Officer R. T. Williamson of the Tulsa Police Department testified that at approximately 7:00 on the morning of March 31, 1971, he and another officer met one Beauford Bourland at a cafe in Tulsa. As a result of that conversation, they accompanied Bourland to an apartment where they found the body of Arlis Delbert Self lying on a bed with three bullet wounds in the head.

Officer Lee Nightingale testified that on the morning in question he went to the scene to find and preserve physical evidence. He found two .38 slugs on the floor next to the bed and stated that he was present when the pathologist extracted another from the decedent's body. He then stated that it was possible to fire a .38 bullet with a .357 weapon.

Dr. Robert Fogel, consultant pathologist with the State Medical Examiner's Office, testified that he examined the body and determined the cause of death to be the direct result of three bullet wounds to the head.

James Milton Sipes who identified himself as a burglar by profession testified that he had been convicted of numerous misdemeanors and had been acquainted with the defendant for approximately five years. Sipes stated that in the early part of April, 1971, he had a long-distance conversation with the defendant who told him that Self had been shot three times with a .357 Magnum. Sipes further related that in November of 1970, the defendant, in the presence of one Albert McDonald, told the witness that he had given $100 to get information as to the address of Self and that he and McDonald had put on ski masks and went to Self's apartment, but found that he had moved. Pugh then told Sipes that Self had cost him $15,000 and two years of his life and that he didn't know anyway to pay him back for the two years of his life. Sipes next saw the defendant at a motel in Little Rock, Arkansas, in April of 1971, in the presence of Albert McDonald and one James Thomas Frasier. At that time the defendant told Sipes that he killed Self, relating that he and McDonald had gone to Self's apartment dressed in ski masks and black trench coats, that he woke Self up and shot him three times in the head and that they disregarded the other occupant in the room since he was drunk and never woke up. Sipes then related another occasion in May of 1971 when he had a conversation with the defendant in the presence of Frasier. In response to the following question Sipes gave the following answer:

"Q. Now, can you tell this Court and jury what was said by Tom Lester Pugh with reference to Arlis Self?

A. Well, him and Frasier, we was all talking about Self testified against him in the bomb—bombing case in Arkansas with Self as the State witness, and he said that Lester said he was hot at everybody involved in the club bombing except for Frasier and that Lester stated he

had to do everything. He had to pay out, cost him $5,500 and he had to take care of the snitch, too."

Sipes further related that in June, 1971, he, the defendant, Frasier, and McDonald were driving around Tulsa when the defendant voluntarily showed Sipes where Self's apartment was located.

On cross-examination Sipes denied that he had been offered any consideration concerning pending criminal charges against him in Arkansas and Oklahoma in return for his trial testimony in the instant case. The witness admitted, however, that he had earlier denied under oath that he knew anything about the Self murder.

The State then called Ruby Charles (Bob) Jenkins who admitted to a lengthy record of felony convictions. Jenkins testified that he knew the defendant and Albert McDonald and that in April, 1971, the defendant came to the Jenkins' home and that Mrs. Jenkins was present. The defendant described how he found out where Self was living and how he had gotten a key made for Self's apartment. Jenkins then testified as follows:

"A. He said that after that day, after he got the key made, later on that evening he and Albert McDonald went back by this apartment. And there still wasn't nobody at home. They unlocked the door and went in the apartment. They left. Later on that night they went back by there. Arlis Self's pickup was parked in front of the apartment. And they put on raincoats and masks.

Q. Did he say what kind of masks, Mr. Jenkins?

A. Ski masks.

Q. All right. And what else did he say?

A. They went into the apartment. Said there was one man laying asleep or passed out drunk on the floor. Said Arlis Self was asleep on a bed.

Albert McDonald stood over the drunk, passed out on the floor. Lester walked in at the end of the bed where Arlis Self was laying.

Q. Did he say what he did then?

A. Yes, sir. He said he pulled his mask up off his face so that Arlis would be able to recognize him, and took his leg there at the foot of the bed, nudged the bed, and Arlis's feet, and called him 'Big'n', said, 'Hey, "Big'n".'

Q. 'Big'n'?

A. Yes, sir.

Q. Had you ever heard that expression before?

A. Yes, sir, I had heard other people refer to Arlis Self as that.

Q. I see. All right. And what did he say then?

A. He said when Arlis Self woke up, he kind of raised his head up and seen who he was, and Lester said he shot him the first shot through the left cheek or temple. He said he went ahead and shot him through the head two more times.

Q. Now, Mr. Jenkins, did Tom Pugh make any additional remarks about the happening there at the Arlis Self residence on this occasion?

A. Yes, sir.

Q. What else did he say?

A. After he shot Arlis Self, he walked back in another room where Albert McDonald was standing over this other fellow, and asked him what about him? And Albert said, well, he hadn't blinked an eye or moved a muscle. And Lester says, 'Do you think he woke up?' And Al says, 'No, I don't.'

And so they left the apartment at that time.

Q. Did Lester Pugh tell you what type of weapon he had on that occasion?

A. Yes, sir, he said he used a .357 magnum pistol.

Q. Did he tell you what he did with that pistol afterwards?

A. Yes, sir. He said after he and Al McDonald split up that night and Al went on towards his home and Lester went towards his home that he disposed of the pistol.

Q. Did he say where he disposed of it?

A. No, sir, he did not."

Jenkins also related that the defendant had told him previous to Self's death of other plots to kill Self. Jenkins then testified as to the conversations with both Pugh and McDonald concerning the events of Self's death.

Jenkins further related that after Self's death he accompanied the defendant to the office of Charles Pope, the defendant's Tulsa attorney, where defendant discussed making arrangements to get an Arkansas case pending against him dismissed as Self had been a witness for the State and was now dead. On cross-examination Jenkins denied that he had been promised anything by prosecuting attorneys in exchange for his testimony against the defendant, but did state that he had hopes of some consideration.

James Guy Tucker, prosecuting attorney for Pulaski County, Arkansas, then testified that when he took office an arson case was pending against the defendant and others and that the chief witness for the State was A. D. Self. After the Self killing, he had no case and dismissed same upon being presented with Self's death certificate by the defendant's local counsel. The State then rested.

The defense then called two witnesses who testified that they were convicted felons and that they each had been contacted by Jenkins to solicit their help in killing Self under the terms of a contract for Self's death stemming out of an armed robbery committed earlier by Self in the eastern part of the country. One George Privett then testified that in April or May of 1971, he traded Jenkins a police monitor radio for his car for two revolvers, a .357 Magnum and a .38. The police subsequently confiscated the guns and upon their return Privett disposed of them.

The defense called S. M. Fallis, Jr., District Attorney for Tulsa County, who admitted that he had agreed not to prosecute Jenkins in Tulsa County since he was willing to testify in the instant case. Fallis denied, however, making such arrangements with Sipes.

Lorraine Alcorn, a close friend of the defendant's wife, then testified that on the evening of March 30, 1971, she and her husband visited the defendant at his home and remained there from about 6:30 p. m. until between 11:30 and midnight. Mary Jo Pugh, wife of the defendant, then testified to essentially the same facts as Mrs. Alcorn and further stated that she was with her husband at their home the remaining portion of the night and that they heard of the Self murder the next day.

The defendant then called Beauford Nelson Bourland, the roommate of Self on the night of the killing. Bourland testified that he was 49 years of age, had been convicted six times for attempted robbery, burglary and escape and that he had a problem with alcoholism. Bourland further stated that he and Self had been drinking heavily for several days prior to Self's death, that on the evening of the killing he brought a fifth of vodka back to the apartment and after he and Self had their fill he laid down and went to sleep.

Sometime during the night he awoke and found himself lying on the floor next to the bed. Self put something over Bourland's head. He then heard the voices of two men, two shots and two persons leaving the apartment. He then went back to sleep. He awoke the next morning before dawn and found Self lying on the bed. Bourland tried to arouse him by shaking his foot and then noticed blood. He then ran out of the apartment, locking the door behind him, fortified himself with some

wine, and called the police. After meeting the police at a cafe, they went back to the apartment, forced open a window and found Self's body lying on the bed. Bourland further related that he had been charged with the murder of Self, but had been freed following a preliminary hearing.

Bourland testified that he did not know the defendant, but had been introduced to him in the Tulsa County Jail by defense counsel the day before. On that occasion defendant repeated the words Bourland recalled being said in the apartment by the two men who shot Self. Bourland, in response to questions of defense counsel, then testified as follows:

"Q. Was the—either of the voices you heard the voice of Tom Lester Pugh?

A. No, sir.

Q. Are you absolutely positive?

A. I'm positive."

On cross-examination the State was allowed over objection of defense counsel to impeach the credibility of Bourland by introduction of a statement signed by Bourland and reading as follows:

"Question: What is your full name, age, and address?

Answer: Beauford Bourland, age forty-seven, 422 East Locust, Tecumseh, Oklahoma.

Question: How long have you known Arlis Delbert Self?

Answer: At least fifteen years.

Question: How long have you occupied the same residence with Arlis Self?

Answer: Since Monday, March 29th.

Question: Starting with Monday the 29th, give us a brief account of the activities of yourself and Arlis Self.

Answer: Me and Arlie, ate supper at the County Court Reporter, Gretchel Davis, house. We went back to his house and slept. Tuesday morning at 8:30 or 9:00 o'clock I went up to Trinity Industries to see about a job, but Sam Nelson couldn't see me. I went back to A. D.'s and then we went to Wagoner until late Tuesday evening. We went to Wagoner and Coweta and returned late Tuesday evening. I got another quart of Vodka and we drank it. He lay down on the bed and I laid down on the floor. I woke up this morning and got up. I call A. D. Big'n. I shook him and told him to wake up. I shook him and got no response. I shook him again and told him to get up. I saw he was dead. I went out of the house and locked the door, then went down to the Savoy and called the police. They came and got me and took me back to the house. They opened a window and I crawled in the window and opened the door.

Question: When you went out to call the police, was the door locked?

Answer: No, but I locked it when I left.

Question: When you woke up and found A. D. bleeding from the nose and apparently dead as you aforestated, to your knowledge, was the room arranged any different at that time than what it was when you went to bed?

Answer: There were some little pieces of wood or something, I don't know what it was, that was there that wasn't there before.

Question: Bourland, do you have any idea who might have done this?

Answer: Yes, I think Lester Pugh killed him.

Question: Why do you think this?

Answer: Because he snitched on Lester Pugh four or five years ago. I know it had to be Albert McDonald or Lester Pugh, but I think it was Lester Pugh.

Question: Is there anything else you want to tell about this that I haven't asked?

Answer: Call Dave Young, County Attorney in Creek County, and he can enlighten me more than anybody."

The defense called Ed R. Crockett who testified that he had represented Bourland as a public defender when Bourland was

charged with the Self murder; that he had moved for production of all statements made by his client and such an order was issued; and that he had never seen the original or a copy of the Bourland statement set out above. The defendant did not testify in his own behalf.

The defendant's first proposition in error urges that the trial court committed reversible error in admitting the entire Bourland statement to be read to the jury for purposes of impeachment. In support of this contention the defendant argues that portion of the Bourland statement to authorities on the day of his arrest as follows:

> "Q. Bourland, do you have any idea who might have done this?
>
> A. Yes, I think Mr. Pugh killed him.
>
> Q. Why do you think this?
>
> A. Because he snitched on Lester Pugh four or five years ago. I know it had to be Albert McDonald or Lester Pugh, but I think it was Lester Pugh."

constituted only an opinion based on hearsay and was in no way inconsistent with any statement made by the witness on direct examination, citing Sturgis v. State, 2 Okl.Cr. 362, 102 P. 57; Cambron v. State, 86 Okl.Cr. 437, 193 P.2d 888; Kennedy v. State, Okl.Cr., 443 P.2d 127; Tippit v. State, Okl.Cr., 332 P.2d 222; Smith v. Wilkins, Okl., 403 P.2d 485 and Wininger v. Day, Okl., 376 P.2d 206.

The defendant further argues that the opinion of a witness as to the guilt of an accused, based solely on the existence of a claimed motive unsupported by factual basis beyond that motive is not admissible evidence, citing Grimes v. State, Okl.Cr., 365 P.2d 739; Wells v. State, 5 Okl.Cr. 22, 113 P. 210; and Yeargain v. State, 76 Okl.Cr. 356, 136 P.2d 696.

An examination of the Bourland statement complained of reflects that it did contain prior inconsistent statements. However, the trial court should not have permitted that portion of the statement specif-

ically complained of and set out directly above to have been read to the jury. This certainly constitutes error under the above cited authority.

■ However, the record as a whole reflects that the entire theory of the State's case was that the defendant's motive for killing Self was that Self had been a witness against the defendant in proceedings filed in Arkansas. This theory dominated the State's case from the beginning. The jury had heard the testimony of Sipes, Jenkins and the prosecuting attorney from Pulaski County, Arkansas. Therefore, the portion of the Bourland statement read to the jury which reflected his opinion that the defendant killed Self because he "snitched", although erroneously admitted as stated above, was insignificant and harmless in the instant case. Under this particular fact situation it is this Court's opinion that the error complained of does not constitute reversible error, see Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340. Defendant's first proposition is without merit.

Essentially, the defendant next urges that the defendant was prejudiced by the failure of the prosecution to make known exculpatory evidence, including plea-bargaining and the extent thereof between the witnesses Sipes and Jenkins and the State. To support his contention the defendant cites Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 which held in part as follows:

> ". . . the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

The defendant further cites United States v. Harris, 462 F.2d 1033 (10th Cir.) wherein the prosecution failed to disclose to defense counsel that plea-bargaining was in process with a prosecuting witness. The Court in the Harris case stated that the jury should have known this aspect of the

case and that fairness required that the defense be given full opportunity to pursue and argue that point in order to impeach the witness.

However, in the instant case, it is obvious from a reading of the record that the jury knew full well that during the preliminary hearing the witness Sipes had testified that he knew nothing of the Self murder and that at the trial he completely changed his statement. The jury knew that Sipes had contacted an assistant prosecutor in Arkansas to advise him that he was testifying and that he hoped officials in Arkansas would give him some consideration. The jury also knew that the prosecuting attorney's office had contacted Arkansas authorities on Sipes' behalf.

With reference to the witness Jenkins, the record is ample that the jury knew Jenkins had high hopes for consideration from prosecuting authorities. This is exemplified by the following portion of the transcript of the testimony of S. M. Fallis, Jr. under questioning by defense counsel:

"Q. And—and did you, with reference to particularly this question, particularly with regard to the robbery in Tulsa County, make any promises to him of immunity on that capital charge?

A. Mr. Briggs, I'm trying to recall if that case was filed at that time. In any event, I have not arraigned—I don't believe Mr. Jenkins has been arraigned on the charge. And if my memory is correct, it was my indication to him that if he would honestly and truthfully testify concerning the matters that we are dealing with here, that I would not seek to prosecute him on that and would grant immunity since he was willing to testify in that case also as to codefendants.

Q. Yes, sir. You at that time granted him immunity in Tulsa County to that charge, and any and all other crimes that he had committed in Tulsa County, Oklahoma, did you not?

A. Well, that's the only one I know about, Mr. Briggs.

Q. Yes, sir. But did you not grant to him immunity to that charge and any and all other crimes committed by him in Tulsa County, in your jurisdiction?

A. Well, I would, yes, if there were other crimes pending. I know of no other crimes.

Q. You know of no other crimes that he has committed, but you did grant him immunity to any and all; didn't you?

A. Well, when we say 'immunity', I think we should explain that the immunity is granted by the Court only, but I indicated to him, certainly, that I would seek that in order to be able to find a solution to this more serious problem."

■ Therefore, the jury was fully advised as to the past records of the witnesses, Sipes and Jenkins; that they had actions pending against them, both in Oklahoma and other states; and that they hoped to get something for their testimony in the instant case. The State did not withhold information from the jury that was material to the guilt or punishment assessed and defendant's second proposition is without merit.

The defendant next contends that reversible error was committed when the prosecutor made improper and prejudicial remarks in the course of his closing argument. The defendant argues that the prosecuting attorney made knowing and wilful reference to the fact that the defendant did not take the stand and testify in his own defense in violation of 22 O.S. § 701, the Oklahoma Constitution and the Constitution of the United States as construed by Griffin v. California, 380 U.S. 609, 85 S.

Ct. 1229, 14 L.Ed.2d 106. The remarks complained of are as follows:

" . . . and there is not one bit of contradiction that Lester Pugh said, 'I killed Arlis Self.' And that he told it to Jim Sipes. That was never contradicted. That he told it to Bob Jenkins. That was never contradicted. And that his motive was to kill over there. That was never contradicted. Do you realize that? Nobody has contradicted that testimony."

\* \* \* \* \* \*

"I'm in good faith when I say to you that under the uncontradicted evidence, uncontradicted, now, did anybody say that Lester Pugh didn't tell Bob that? Did anybody say that Lester Pugh didn't tell Sipes that? See what I mean?"

In Story v. State, Okl.Cr., 478 P.2d 929, this Court, citing Denney v. State, Okl.Cr., 346 P.2d 359, held as follows:

"The Oklahoma statute prohibiting comment on the failure of defendant to testify is comprehensive in the extreme and the Court of Criminal Appeals will not enlarge nor extend its provision so as to prevent a fair discussion of the evidence, even though the defendant did not testify and called no witness in her behalf. This statute will not be deemed to go to the extent of prohibiting comment upon the inferences reasonably to be drawn from a failure to controvert the State's evidence by proper proof other than that which might be given by the defendant personally."

See also Tilford v. State, Okl.Cr., 437 P.2d 261.

*Griffin*, supra, is distinguishable as it is a case wherein the comment of the prosecutor directly and unequivocally called attention to the failure of the accused to testify. However, in the instant case Sipes testified that one James Frasier and the co-defendant McDonald were both present when the defendant admitted that he had killed Self. Jenkins' wife was present during the conversation between Jenkins and the defendant in the Jenkins' home when the defendant admitted that he had killed Self. Jenkins' wife was present during the conversation between Jenkins and the defendant in the Jenkins' home when the defendant admitted the killing and gave numerous details. Therefore, Frasier and Jenkins' wife could have been called to deny that any such conversations occurred. It is also possible that the co-defendant McDonald who was not on trial in the instant case could have been called for the specific purpose of denying that any such conversations occurred.

In Tilford v. Page, 307 F.Supp. 781, the United States District Court for the Western District of Oklahoma, citing United States v. Reid, 10 Cir., 415 F.2d 294, held that a comment of the prosecutor about the defendant's failure to take the witness stand must directly and unequivocally call attention to the failure of the accused to testify and must be such that the jury would naturally and necessarily understand the statement to be a comment on the failure of the accused to testify in his own behalf. In the instant case the record is not so clear, and it is the opinion of this Court that the statements complained of did not constitute error. It should also be pointed out that at the time both statements were made, defense counsel made no objection.

The defendant next complains of the following statements of the prosecutor:

"It takes guts to stand up to the underworld and this kind of crime in this county and this state, and say 'We're not going to let it happen again. And the people that are guilty are going to be punished.' It takes guts to do those kinds of things in this courtroom."

\* \* \* \* \* \*

"You've seen a part of the underworld and the thugs in Tulsa County and this State. The only way that we can stop these kind of people is to have people with guts enough on a jury to come back with verdicts against this man and men like him."

With reference to the first statement above, the record reflects that no objection was made by defense counsel. With reference to the second statement an objection was made but defense counsel did not request that the jury be admonished to disregard the remark. We have consistently held that unless the remarks were of such a nature that they could not be cured by withdrawal, defense counsel must not only object, but move to have the jury admonished. See Sam v. State, Okl.Cr., 510 P.2d 978 and Walters v. State, Okl.Cr., 455 P.2d 702.

In another statement complained of by defense counsel the prosecuting attorney implies that if a verdict is not returned which is correct under the evidence then all the hard work done by his office and law enforcement officers would have been in vain. Again, however, the defense counsel did not request that the trial court admonish the jury and the error, if any, is waived. Therefore, defendant's third proposition in error is without merit.

The defendant's last proposition in error urges that the defendant was denied a fair trial by the trial court's denial of a change of venue made necessary by unprecedented pre-trial publicity. It is abundantly clear from the lengthy voir dire examination appearing in the record that the trial court gave the defendant very wide latitude in examining the prospective jurors and that all jurors composing the final panel stated that they would decide the case based upon the evidence presented at trial and not from what they may have heard or read. There is no evidence of an abuse of discretion by the trial court in the instant case.

This Court cannot require that a juror not read articles or see reports of the case in the news media. It is sufficient that a juror can lay aside his opinion, if any, and render a verdict based on the evidence presented to him in court. See Sam v. State, Okl.Cr., 510 P.2d 978. In the instant case there is no evidence that the jury did not reach a verdict based solely on the evidence presented in court. Therefore, defendant's last proposition in error is without merit.

In consideration of the lengthy record as a whole, we do not find that the defendant has been deprived of any substantial right, but that the issues were fairly presented to the jury, and defendant received a fair and impartial trial. The verdict and judgment appealed from is, accordingly, affirmed.

BRETT, J., and DONALD E. POWERS, Special Judge, concur.