Louis Eugene WILSON, Plaintiff in Error,

v.

The STATE of Oklahoma, Defend-
ant in Error.

No. A–15142.

Court of Criminal Appeals of Oklahoma.

July 23, 1969.

Rehearing Denied Sept. 17, 1969.

Bruce W. Gambill, Pawhuska, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Prudence Little, Asst. Atty. Gen., for defendant in error.

BUSSEY, Judge.

Louis Eugene Wilson, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Osage County with Armed Robbery; his punishment fixed at fifteen years imprisonment in the State Penitentiary; and a timely appeal has been perfected to this Court.

The record discloses that Polly Davis was the first witness on behalf of the State. She testified that on March 5, 1968, she was working in the Osage County Tag Office. Between 11:00 and 12:00 on that day, the defendant entered the office, inquired about car tags and left. She pointed out the defendant in court. About 2:00 p. m. he returned with two other men, Stanley and Sheppard. Stanley and the defendant pulled guns and they demanded that she and the two women working with her go to the back room. She then heard a commotion in the front room and then heard the three men leave. She went to the front and saw the men running across the street. She went to the barber shop next door and told them what had happened. She checked her drawer and found over $400.00, two checks and a money order missing. She identified three bits of paper as being parts of these checks and money orders. On cross-examination, she described the office and the appearance of the defendant on the day in question.

Marie Leigh testified that she was working in the tag office on the day in question, and three Negro men came in the office; one of them pulled a gun. Stanley and Sheppard were two of the men. She was ordered to the back room with the other women. She then heard money rattling in the front. After they left she found the money tray dumped out.

Barry Thomas testified that on the day in question he was behind his apartment with two friends. The apartment house is across the street from the tag agency. A white Buick convertible, unfamiliar to him, came down the alley at a fast pace sometime between 1:00 and 2:00 p. m.

Four Negro men were in the car. The car went into the parking lot next to the apartment building. About fifteen minutes later the car came back down the alley at a faster pace. A few minutes thereafter a barber from the shop across the street came around the apartment house and they went with him to the tag office and talked with officers.

William Totton testified to the same events as Barry Thomas adding that the car was damaged and had a bent Oklahoma tag. He talked with Officer Johnson at the tag agency and went with him to identify a car they suspected as being the one that had been in the alley. He identified the car and then observed Watson come out of the house with police officers.

E. W. Thomas testified to the same events and added that he recognized a person later to be identified as Earl Watson, as being in the car.

John Burris testified that he was a police officer and that on the day in question he heard a radio message concerning the robbery and was cruising the area. He went to 119 East Newton where the vehicle was spotted. Several other officers were there. They were refused entry by Carrie Woods. They then checked out a garage in the back and another officer looked in the basement of the house. He went to the front door again and a voice called for them to come in. Watson was sitting on the couch. They were going to him when another person, Sheppard, came in with a gun. They backed out with Watson. Tear gas was thrown into the house and Sheppard came out. The defendant then came out a window. Officer Johnson came out with another suspect, Stanley.

Leonard Bates testified that on the day in question he answered a call to 119 East Newton. He went to the door with other officers and was refused entrance. Later, they went back to the door and a voice called to them to come in. His further testimony was the same as Burris's. He added that a white Buick convertible was

in the driveway with the radio on and the door open.

Officer Harper testified that he went to 119 East Newton in response to a radio call. He observed the same events as did the other two officers and stated that the glove compartment was open and a box of shells was in it. Officer Johnson arrived with a witness who identified the car. Some officers went to the front door. They did not enter at that time; however, ten minutes later they returned to the door and entered. They backed out with Watson after some yelling about a gun. Tear gas was used and Sheppard and Wilson came out.

Officer Williams testified to the same facts but added that he had checked out the basement before going to the door on the first try to enter. He found nothing. He then returned to the porch and someone said to come in.

Officer Edmunds testified that the next morning he returned to the house with a search warrant. He recovered particles of burned papers from the stool which had been identified by Polly Davis as being from the tag office.

Officer Johnson testified that on the day in question he was called to the tag agency. He found Mrs. Davis in a disheveled state. He got a description and put it on the radio. He obtained the description of the auto from Totton and put it out. He took Totton to the residence to identify the car. He went to the door and was told to come in. He arrested Watson. He repeated the testimony of others but added that he entered the house after the tear gas had been thrown and found Stanley in a closet.

Carrie Woods then testified that the defendant came by her house at 12:30 on the day in question. He asked to borrow her car—a white Buick convertible. He came back to the house at a later time accompanied by three other men, Watson, Sheppard and Stanley. She heard some talk about police coming. The fellows went to the back of the house and she went to the front to answer the door. After going to the door she went to the back of the house and met Sheppard coming to the front of the house with a gun. Tear gas was thrown and she went out with her children.

As his first assignment of error, the defendant urges that the trial court erred in permitting witness Polly Davis to make an in-court identification of the defendant.

A hearing was held, outside the presence of the jury, to determine if the in-court identification was based on the lineup identification of the defendant, conducted some three and one-half hours after the robbery, at which lineup the defendant was not represented by counsel in violation of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. In construing *Wade,* supra, we set forth recommendations and guidelines to be followed by the trial court in determining whether the in-court identification was based in part upon the lineup identification or whether the witness would have been able to identify the defendant independent of the lineup identification. These guidelines appear in Thompson v. State, Okl.Cr., 438 P.2d 287, in the following language:

> "In determining the admissibility of the courtroom identification of such witness, the trial court should conduct a hearing outside the presence of the jury and determine if, independent of the lineup identification, the witness can make positive identification of the accused, taking into consideration the following: the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture' of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup."

At the hearing conducted by the trial court, outside the presence of the jury, on this question, the following facts were adduced: the witness, Polly Davis, had observed the defendant in the tag office for two or three minutes prior to the robbery, and observed him for an additional two or three minutes during the robbery, from all angles. She reported his description to the police, but was unable to give an exact estimate of his height except that she demonstrated to them how tall he was. She did not identify any other person prior to the lineup, nor did she view any picture of the defendant prior to the lineup and stated, in response to a question propounded by the court, that she was positive that she could identify the defendant independent of viewing him at the lineup.

■ Although the defendant was not represented by counsel at the lineup, an attorney representing other defendants in said lineup stated that the lineup was conducted in a fair manner and that all suspects viewed in said lineup were of similar age, race, height, etc. Certainly, under the guidelines set forth in *Thompson*, supra, there was ample evidence from which the judge could judicially determine that the courtroom identification was made independent of the lineup identification and we are, therefore, of the opinion that this assignment of error is without merit.

■ As his second assignment of error the defendant urges that the trial court erred in admitting the testimony of William Totton, C. W. Thomas and Barry Thomas with regard to automobile identification. We believe that the excellent brief of the State amply answers this proposition.

"Three men testified that they were behind an apartment house which is across the street from the tag agency. They saw an unfamiliar car go down their alley about the time of the crime, park and then return down the alley at a great rate of speed a few minutes later. Almost immediately the barber came running from the direction of the tag agency asking about three men. Thus the testimony was tied very directly to the crime in time and place. There was a great probability that the men in the car had some connection with the crime since they did not live in the neighborhood yet were in the alley. This is strange. Also the men who committed the crime had run in the direction of the alley. Any testimony concerning these individuals, their description or the description of the vehicle they were driving would be very relevant in trying to find suspects. The description of the car they saw matched the car found outside the defendant's house. One of the men who had been in the car was found with the defendant a short time later. There had been four men in the car and there were four men found. The testimony is not too remote and in fact is very closely associated with the events of the crime.

The case of Fairris v. State, Okl.Cr., 287 P.2d 708 (1955) concerned the admissibility of evidence of a strange man running through a yard. The court held that the evidence was properly admissible. The court held that it was so close in point of time as to be admissible as part of the res gestae. It is part of the transaction immediately surrounding the crime."

For the reasons above set forth, we are of the opinion that this assignment of error is without merit.

This leads us to defendant's third assignment of error that the trial court erred in overruling the Motion to Suppress the testimony of Officers John Borroughs, Larry Johnson, Leonard Bates, D. L. Harper, Jack Williams, and Wayne Edmunds. The defendant contends that the police illegally broke into the house and arrested the defendant and thus no evidence or testimony relating to or following from this, should have been admitted.

■ The record does not reflect this contention. The officers arrived on the scene after finding a car in the driveway which was positively identified as the car which had been in the alley across the

street from the tag agency which had been robbed. Three witnesses had seen this car go down the alley, park and a few minutes later come back. Almost immediately thereafer, a man came running to the area to see if they had seen three Negro men in the area as the robbers had run in that direction. The car, and only this car, had been seen. There was great strength in the presumption that the car had contained the robbers. The car had been pulled into the driveway of the residence in a hurry and the radio had been left on in the haste. In plain sight in the car was a box of .22 shells. The officers had more than probable cause to believe that the men who had committed the felony were in the house. The garage was checked out for safety reasons. The officers went to the door and were refused entry. They did not, in fact, break in at that point as the defendant contends, but left. The statements in defendant's brief are out of context. The witness continued to say (CM 310):

"Q. Did you ever hear anyone say to come in?

A. Yes.

Q. Who was it?

A. The boy by the name of Watson.

\* \* \* \* \* \*

Q. How close in time was this to her refusal to let you in the house?

A. Approximately two to three minutes."

The officers went to the door twice. The first time they were refused entry and left. They returned a second time and were told to come in. Following this statement, and only after they were told to come in, did the officers enter the house.

After entering the house, they were approached by Sheppard who had a gun pointed at them and said he was going to kill them. The officers left the house, but another felony had been committed and they had grounds to arrest Sheppard and the probable cause they had to believe these were the robbers was strengthened. The

arrest of the individuals was a valid arrest based upon probable cause and the search warrant obtained to return to the house to search it the next day was valid. Any evidence relating to and flowing from the arrest was admissible evidence.

Title 22 O.S.1961, § 196(3) states:

"A peace officer may, without a warrant, arrest a person:

\* \* \* \* \* \*

When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it.

\* \* \* \* \* \*."

■ Paragraph number three to the Syllabus of Wafers v. State, Okl.Cr., 444 P.2d 825 (1968) contains the following language:

"The use of the term 'probable cause' or 'reasonable cause' itself imports that there may not be absolute, irrefutable cause. If the facts are such that a reasonable, prudent man would have believed accused guilty, and would have acted upon that belief, a police officer is justified in making an arrest without warrant, although subsequent events prove that no offense had been committed, or if committed, that accused had no connection with it, where the statute authorizes arrest without warrant when the officer has reasonable grounds for believing that the person arrested had committed a felony, although not in his presence."

The officers did not need absolute cause to believe that these men had committed the robbery, but only probable cause to believe so. These men had been seen fleeing from the scene of the robbery and when the officers were questioning them, one of the men assaulted them with a gun. At this point they had valid grounds upon which to arrest the one with the gun because a felony had been committed in their presence, and it strengthened the probable cause upon which to arrest the others. The court was correct in allowing the evidence to be admitted. We must, therefore, hold

that this assignment of error also is without merit.

▇▇ Defendant next contends that the trial court erred in overruling his Motion for Mistrial on the basis of the District Attorney's statements in final argument stating that the record reflects that defendant was arrested on March 5, 1968, and had remained incarcerated therein until date of trial and that he would have credit for the time so served.

We do not believe that this assignment of error is properly before the Court since the closing argument of the District Attorney is not preserved in the record, nor does it appear that any objection was interposed at the time the remark was made. It does appear, however, that the defendant moved for a mistrial and the court overruled the motion but recognized the objection and admonished the jury to disregard any statements in regard to time served in jail before the trial because this was not in evidence. We believe this assignment of error must fail for two reasons: First, the question was not properly preserved for review on appeal under the rule set forth in Grimes v. State, Okl.Cr., 365 P.2d 739, wherein we stated:

> "Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel."

Second, when the defendant moved for a mistrial, the court admonished the jury to disregard said remarks. From the comparatively light sentence imposed against the defendant, it is readily apparent that such remarks did not influence their decision in the light of the evidence and the court's admonition. We must, therefore, hold that this assignment of error is without merit.

▇▇ It is lastly contended that the trial court erred in overruling the Motion for New Trial for the reason that a newspaper article was published on October 1, 1968, in the evening edition, prior to the next day jury verdict, in which it was stated that a co-defendant was found guilty of this same crime on that date. This assignment of error is also concisely answered in the brief of the State, as follows:

> "The Oklahoma and federal courts agree that it is not a denial of due process to place the burden of proving that a juryman had read news articles on the defendant. See McGowen [McGowan] v. State, Okl.Cr., 377 P.2d 975 (1963); Glasgow v. State, Okl.Cr., 370 P.2d 933 (1962); and Welch v. U. S., 371 F.2d 287 (10th Cir. 1966). Paragraphs 1, 2 and 4 of the syllabus in the *Glasgow* case state:
>
> > 'Before the final submission of a case to the jury, the burden to show prejudice from an alleged misconduct is on defendant.'
> >
> > 'The burden is on the appellant to make a showing that the jury's verdict was invluenced by an alleged unfavorable newspaper article.'
> >
> > 'A claim of misconduct of a juror before a criminal case is submitted to a jury is not to be determined by inference or on the basis of speculation, but must be established by clear and convincing proof.'
>
> "The Tenth Circuit used the following language in the *Welch* case:
>
> > 'To conclude that appellant was denied a fair trial because of the factual reporting of Judge Corn's appearance in court and the witness Carroll's inadmissible testimony requires the application of dual presumptions: that the jurors were both exposed to the publicity and were prejudiced thereby. The law will presume neither. Beck v. Washington, 369 U.S. [541], 558, 82 S.Ct. 955, 8 L.Ed.2d 98, rehearing denied, 370 U.S. 965, 82 S.Ct. 1575, 8 L. Ed.2d 834. Latham v. Crouse, 10 Cir., 330 F.2d 865 [379 U.S. 866], 85 S.Ct. 134, 13 L.Ed.2d 69 and appellant has

**322**

failed to show either as a "demonstrable reality", United States et al., Darcy v. Handy, 351 U.S. 454, 762, 76 S.Ct. 965, 100 L.Ed. 1331.'

The defendant cannot base an argument for reversal on only the fact that a newspaper article appeared."

Having answered all of defendant's propositions urged on appeal, we are of the opinion that the defendant had a fair and impartial jury, that the issues were properly submitted to the jury, and that the evidence amply supports the verdict. For all of the reasons above set forth we are of the opinion that the judgment and sentence appealed from should be, and the same is hereby, affirmed.

TOM BRETT, P. J., and NIX, J., concur.