Albert McDONALD, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–74–772.

Court of Criminal Appeals of Oklahoma.

July 30, 1976.

Jack B. Sellers, Sapulpa, for appellant.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellant, Albert McDonald, hereinafter referred to as defendant, was charged in

the Tulsa County District Court, and after a change of venue was tried and convicted in the District Court, Bryan County, Case No. CRF–73–33, for the crime of Murder, in violation of 21 O.S.1971, § 701. The jury fixed his punishment at Life imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

In the instant case the defendant was tried and convicted for .the murder of one Cleo Epps. The case presented by the State disclosed that at some time prior to August 25, 1970, Loda Bough, a neighbor of Cleo Epps, observed Epps and the defendant talking near a hole on Epps' property located approximately four miles northeast of Sapulpa, Oklahoma. As Epps was walking away, Mrs. Bough noticed that the defendant knelt down to the hole and afterwards walked away with something in his hands.

On August 25, 1970, Tulsa County District Judge Fred Nelson's automobile was bombed while he was in it. On August 26, 1970, Jack McKenzie, an investigator for the District Attorney's Office of Creek and Okfuskee Counties, observed Cleo Epps, Tom Lester Pugh and the defendant talking in front of Epps' home. Later that same day, McKenzie talked to Epps on the telephone. Following their conversation, he returned to the Epps home and examined the hole on her property. There he discovered a buried steel box which contained dynamite. After further inquiry by Investigator McKenzie and Frank Thurman of the Tulsa County Sheriff's Office, Cleo Epps eventually testified, during late September, 1970, before the grand jury investigating the bombing of Judge Nelson.

On November 12, 1970 Epps was having dinner with John and Loda Bough at the Bough's home which was located on Epps' property. Around 6:00 p. m., the defendant came to the Bough's house and asked to see Epps. Following a brief discussion in the kitchen, the defendant and Epps left the house. This was the last time the Boughs saw Cleo Epps alive.

On November 20, 1970, Epps' pickup truck was found in the parking lot of Union Square Shopping Center at 51st and Union Streets in Tulsa, Oklahoma. Police authorities inspected the vehicle and were unable to find any identifiable latent fingerprints.

Tommy Gilbert, Epps' nephew, began searching for Epps shortly after her disappearance. On February 24, 1971, Gilbert found indications that his aunt's body was in a remote area in the 6700 block on South Union, Tulsa, Oklahoma. The police were contacted and the body was discovered in a septic tank near an abandoned building at that location. The body was covered by several hundred pounds of rock and various cloth items were around the victim's head. Later, it was determined that one of the cloth items was a towel which had two small holes in it about one quarter of an inch in diameter.

It was stipulated at trial that the autopsy performed properly established that the body was that of Cleo Epps and that she was the victim of a murder, her death being caused by two bullet wounds in the head. A ballistics test further established that the bullets were compatible with that of a .22 caliber slug.

The State's case was concluded with the testimony of the chief witness, Rubie Charles Jenkins. Jenkins, convicted of murder in California on January 9, 1973, testified that he met the defendant during the spring of 1970. According to Jenkins, he and the defendant drove from Tulsa to Oklahoma City in late October, 1970. During the trip, they discussed the grand jury investigating the Nelson bombing and the defendant told Jenkins that he and Epps had dug up some dynamite which had been buried on Epps' property. He also related to Jenkins that the police had searched his car and had taken the floormat where the dynamite was placed. The defendant also told Jenkins that he suspected Epps was giving information to the po-

lice and the grand jury due to her friendship with Investigator McKenzie and her particular knowledge of the dynamite. The defendant further informed Jenkins that he had contacted Tom Lester Pugh to obtain assistance in the bombing of Judge Nelson.

Approximately two days after their first trip to Oklahoma City, Jenkins and the defendant went to Oklahoma City again. However, this time Tom Lester Pugh joined them. During the trip, the witness listened as the defendant and Pugh talked about the bombing of Judge Nelson and speculated as to what Epps could have told the grand jury.

On October 31, 1970, the three men drove together from Tulsa to McAlester. Jenkins disclosed that the same topics were discussed as before except that Pugh said to the defendant, "we are going to have to do something to her, to—to Cleo Epps. If we don't she is going to send both of us to the penitentiary." [Tr. 1019] In response to this statement the defendant added, "that's right." On November, 8, 1970, the men again drove to Oklahoma City from Tulsa and again the defendant and Pugh discussed the bombing of Judge Nelson and their concern with Cleo Epps.

Jenkins further testified that at some time around November 9, 1970, the three men met for coffee at the Holiday Inn located in west Tulsa. As they were leaving, Pugh said to the defendant, "old buddy, we have got something that we've got to do in the next few days. If we don't, she is going to send us both to the penitentiary." The defendant responded, "I know that." [Tr. 1022]

The witness stated that he learned of the death of Epps during a trip with Pugh and the defendant to Idabel, Oklahoma, on November 13, 1970. Jenkins was informed as to how the defendant got Epps out of the house and how Pugh and the defendant met her at the Union Square Shopping Center, where her pickup was later found on November 20, 1970. Pugh and the defendant related to Jenkins that at the shop-

ping center Epps got into the front passenger seat of the car driven by the defendant and Pugh sat in the back. They then drove to either 71st or 81st and Union Streets where Pugh, using a towel to prevent blood from getting on the car, shot Epps in the back of the head with a .22 caliber pistol. When they reached the area where they planned to dispose of the body, Epps regained consciousness. Pugh then shot her again and the body was hidden.

The defense presented testimony at trial to establish that Cleo Epps was a well known bootlegger, police informer and "fence" for stolen property. The defense attempted to connect Epps with a 1970 Dodge which had been involved in an insurance fraud concerning Jenkins in Arizona. The car had been driven to Oklahoma by Jenkins' nephew during the summer of 1970. There was testimony given which established that a 1970 Dodge was on Epps' property in early November, 1970, and was later discovered on her brother's property near Wagoner, Oklahoma, on November 25, 1970, a short time after her disappearance.

The defense further offered testimony which sought to establish that Epps and Jenkins had made a deal whereby Epps was to "fence" the 1970 Dodge and some jewelry. The testimony given attempted to indicate that Epps kept the car and jewelry and failed to pay Jenkins. Burns Trusty, a witness for the defendant, stated that Jenkins told him that he was mad at Epps and killed her with the aid of his wife. Also, the defense pointed out that Jenkins' home was located within one mile of the area in which Epps' body was eventually found.

The defense also presented the stipulation that there was no evidence obtained from the investigation of the defendant's floormat which could conclusively associate the defendant with the bombing of Judge Nelson. Furthermore, Tom Lester Pugh testified that the defendant was never present during any of the trips with Jenkins, and he further denied making any statements to Jenkins in reference to either

the bombing of Nelson or the murder of Cleo Epps.

In rebuttal the State called two witnesses. Tom Bunting, an agent with the Oklahoma State Bureau of Investigation, testified that he transported Tom Lester Pugh to Durant on May 8, 1974, so that Pugh could testify in the instant case. During the drive Pugh said to Bunting, "I could put it on him. But I have to use him in my trial." [Tr. 1639] The second rebuttal witness, William L. Wise, stated that he was a rancher in Idabel, Oklahoma. Wise testified that on November 13, 1970, three people came to his home in Idabel. The witness identified the defendant as one of these people.

The defendant's first assignment of error asserts:

"Appellant was denied the fair and impartial trial guaranteed him by the constitutions of the United States and the State of Oklahoma by knowing failure of the prosecution to disclose the existence of exculpatory evidence previously requested by the appellant."

The State's evidence revealed through the testimony of Rubie Charles Jenkins that he, Lester Pugh and the defendant went to Idabel, Oklahoma, on November 13 or 14, 1970. Jenkins related that during that trip the defendant and Pugh described to Jenkins how they had killed Cleo Epps and disposed of her body. To the contrary, the defense produced the testimony of Lester Pugh and Burns Trusty, Jr., that they had accompanied Rubie Charles Jenkins to Idabel, Oklahoma, and that the defendant was not present. Consequently, at the close of the defendant's case the State offered the rebuttal testimony of William L. Wise, who related that his home had been robbed on November 13, 1970, and he identified defendant as being one of the robbers. Mr. Wise also testified that he did not remember having been shown any pictures of Albert McDonald.

On the supplemental motion for new trial, defendant asserts that the prosecutor possessed knowledge that one James Pelfrey had been charged by preliminary information filed on December 9, 1970, in McCurtain County District Court, for the Wise robbery and that such information along with the alleged identification of Pelfrey should have been disclosed to defendant premised upon his discovery motion which stated in part: ". . . all statements, recordings, reports, correspondence, and information now in the possession or under the control of the State . . . which contain statements which support or tend to support the theories of defense of this accused of which exculpate or tend to exculpate this accused from any involvement in this crime charged."

Also relevant to the issue of criminal discovery is 22 O.S.1971, § 749,[1] which does not permit discovery of statements alone unless they are sworn statements and *State ex rel. Fallis v. Truesdell,* Okl.Cr., 493 P.2d 1134 (1972), declared that an accused is not entitled to discovery and inspection of unsworn statements of a State's witness in the possession of the State. However, such principles cannot be applied in a manner which infringe upon the constitutional mandate of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In the instant case we find no violation of this statute or in the principles of *State ex rel. Fallis v. Truesdell,* supra, and thus we consider the defendant's complaint of the State's conduct in light of the constitutional claim.

1. 22 O.S.1971, § 749, reads as follows:
"A. In the investigation of a criminal offense, the district attorney or any peace officer may take the sworn statement of any person having knowledge of such criminal offense. Any person charged with a crime shall be entitled to a copy of any such sworn statement upon the same being obtained.

"B. If a witness in a criminal proceeding gives testimony upon a material issue of the case contradictory to his previous sworn statement, evidence may be introduced that such witness has previously made a statement under oath contradictory to such testimony."

This constitutional claim is predicated on several propositions. The defendant first contends the prosecution knowingly permitted false testimony of rebuttal witness Wise to be introduced into evidence at defendant's trial. Such a contention is apparently predicated upon the due process principle observed in *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). See also, *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and, *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The defendant argues that the false testimony introduced which went uncorrected by the State occurred during the cross-examination of Wise, which is reflected in the transcript of the trial proceedings as follows:

"BY MR. SELLERS:

"Q. Now, Mr. Wise, I want to ask you if it isn't true that you were shown photographs of Mr. McDonald as early as the spring of 1973?

"A. Mr.—may I call you 'Mr. Sellers?'

"Q. I don't know. We have never met —

"A. (Interrupting) I think, perhaps, I know your name.

"Q. How do you know my name?

"A. Well, I have read it in the paper, that you were representing Mr. McDonald, I believe. But anyway—ah—I cannot remember whether I have ever seen a photograph of Mr. McDonald or not.

"Q. Well, let me direct your attention, Mr. Wise, to a—a lineup, in Tulsa, Oklahoma. Do you remember the lineup, up there—

"A. (Interrupting) Yes, sir, I do.

"Q. (Continuing)—where Mr. McDonald—

"A. (Interrupting] Yes, sir.

"Q. (Continuing)—and I were present?

"A. Yes, sir.

"Q. And do you remember I attempted to talk with you, there?

"A. Yes, sir.

"Q. And you refused?

"A. Yes, sir.

"Q. And I had a Court Reporter there, to take down anything that was said, and you declined? Isn't that correct?

"A. I don't know about the Court Reporter. I know I declined to talk with you, yes sir.

"Q. And, as a matter of fact, they took you over to the Sheriff's office, and I followed, over there, and—I mean, from the—followed, over there, with the Court Reporter, and again asked to talk with you, and you refused?

"A. I did refuse. I do not know about the Court Reporter.

"Q. Now then, you tell this Court and jury that you have never seen a photograph of Mr. Albert McDonald before this day?

"A. I saw an awful lot of photographs, at one time. And whether there was one of McDonald in it or not, I don't remember.

"Q. All right. You weren't able to pick out any photograph? Is that what you are telling the Court?

"A. I don't—I believe I could have picked out a photograph of Mr. McDonald if I had seen it, sir.

"Q. Well, when was this that you were shown all these photographs?

"A. I was shown some photographs in Idabel, Oklahoma—

"Q. (Interrupting) When?

"A. Shortly after November 13th.

"Q. What year?

"A. 1970.

"Q. All right. And how about after— November 24th of 1971? Were you

shown photographs between then and the time you went to the lineup?

"A. Not to my recollection, no, sir." (Tr. 1645–1657)

To evidence the falsity of this testimony the defendant refers to the affidavit of one Ms. Sandra Fogley,[2] former Assistant District Attorney of McCurtain County, Oklahoma, in 1972. The affidavit in part states:

". . . in my presence Mr. Wise was shown photographs of Albert McDonald and others including a photograph of Mr. James Pelfrey which was taken from the McCurtain County District Attorney's files relating to McCurtain County District Court Case No. CRF–70–209 styled *State of Oklahoma v. James Pelfrey* wherein Mr. Pelfrey had been charged with the robbery of Mr. Wise. Mr. Wise failed to identify Albert McDonald or any of the other persons in the photographs shown to him except for Mr. Pelfrey. In regard to Mr. Pelfrey, he simply reiterated that that was the man he had previously identified as being the unmasked one who had robbed him. He explained that three men had robbed him but that only one was unmasked."

We are not persuaded that the record supports the defendant's contention. Ms. Fogley's affidavit does not establish as a fact that the testimony of Mr. Wise at trial was false. Mr. Wise simply testified that he did not recall the photo showing which may have occurred some two years prior to his testimony at trial. Mr. Shaf-fer, Assistant District Attorney in Tulsa County at the time of this alleged photo showing and at the time of the trial of the instant case, testified at the preliminary hearing in the robbery charge filed against the defendant,[3] and stated that he did not recall a photo showing at the meeting in 1972, which was the meeting alluded to by the Fogley affidavit. Although the record in toto supports the conclusion that the alleged photo showing did occur at the meeting in the spring of 1972, we find the introduction without correction of Mr. Wise's failure in memory does not rise to the conduct proscribed in *Napue v. Illinois,* supra, and related cases. Therefore, we find no denial of due process occurred in the introduction of this testimony.

The defendant further contends that the prosecution failed to disclose the existence of exculpatory evidence requested by the defendant, citing the doctrine enunciated in *Brady v. Maryland,* supra.[4] The defendant argues the prosecution had knowledge of and failed to disclose upon defendant's timely motions for disclosure the following exculpatory information:

1. That rebuttal witness Wise had previously identified one Pelfrey and not McDonald as the unmasked robber of November 13, 1970, resulting in a preliminary information regarding the robbery being filed in the McCurtain County District Court against Pelfrey; and

2. That Wise failed to identify a photo of McDonald exhibited to him during the meeting in the spring of 1972 in the McCurtain County District Attorney's

---

2. The affidavit of Ms. Fogley was submitted at the hearing on motion for new trial and supplemental motion for new trial in support thereof.

3. Pursuant to Rule 1.15 of the Rules of this Court, and pursuant to the principles enunciated in *Renfro v. State,* Okl.Cr., 480 P.2d 926 (1971), we take judicial notice of the preliminary hearing transcript of the proceedings in the robbery charge filed against the defendant in the McCurtain County District Court, Case No. CRF–73–35, which became the records of this Court in the case of

*The State of Oklahoma v. Albert McDonald,* Case No. 0–74–551. The robbery of Mr. Wise was the subject of this robbery charge filed against defendant in March, 1973, and preliminary hearing was held in that case on the 21st of May, 1974.

4. The often cited doctrine in *Brady v. Maryland,* supra, essentially is an expansion of the principles set forth in *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, rehearing denied 294 U.S. 732, 55 S.Ct. 511, 79 L.Ed. 1261.

office when Assistant District Attorney Shaffer and Assistant District Attorney Hagadorn of Tulsa County had occasion to visit the McCurtain County District Attorney's office.

In support thereof the defendant once again refers to the affidavit of Ms. Fogley and also alludes to the testimony of Payne, District Attorney of McCurtain County at the time of this alleged photo showing, and testimony given by Dale, at that time investigator for the District Attorney office in McCurtain County, at the motion for new trial hearing.

In *Brady v. Maryland,* supra, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." at 373 U.S. 87, 83 S.Ct. 1196. Later, in *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the Court declared:

> "The heart of the holding in Brady is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. . . ."

Although the Court went on to say:

> "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. . . ." (at 408 U.S. 795, 92 S.Ct. 2568)

In construing this doctrine, the Court in *United States v. Ruggiero,* 472 F.2d 599 (2nd Cir. 1973), found the purpose of the Brady rule is not to provide a defendant with the complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied acess to the exculpatory evidence known to the government but unknown to him. Also, in *Calley v. Callaway,* 519 F.2d 184 (5th Cir. 1975), the court in reviewing the Brady rule stated that the essential purpose of the Brady doctrine in broadened criminal discovery is to equalize access to available evidence and give both the defense and the prosecution the maximum information practical with which to prepare cases. See also *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). Further, the fact that Brady establishes "equal access requirement and not a broad discovery rule" is indicated in *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). As there the Supreme Court noted that:

> "[A]lthough the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, but cf. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), it does speak to the balance of forces between the accused and his accuser. . . ." (at 412 U.S. 474, 93 S.Ct. 2212)[5]

Also, the Tenth Circuit, in *United States v. Miller,* 10 Cir., 499 F.2d 736 (1974), in commenting upon the Brady rule stated:

> "Under some circumstances, the government's suppression of beneficial impeachment evidence affecting the credibility of a key prosecution witness may result also in such unfairness as to violate due proc-

---

5. Also in *Calley v. Callaway,* supra, the Court noted the leading articles on enhanced criminal discovery, as, Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth? 1963 Wash.U.L.Q. 279; Goldstein, the State and the Accused: Balance of Advantage in Criminal Procedure, 69 YaleL.J. 1149 (1960). Also a prerequisite to establish non-disclosure is that the prosecution had knowledge of information and that the defense did not have such knowledge or access to the information in question. In the instant case there is some uncertainty as to whether or not some of the alleged information withheld was known to the defendant.

ess. *United States v. Harris,* 462 F.2d 1033 (10th Cir. 1972). If the prosecution's failure to produce was not deliberate, the test for reversal on appeal is whether the trial was not merely imperfect but rather 'unacceptably unfair.' *United States v. Harris, supra.* And where the evidence allegedly suppressed is not material to the question of the guilt or innocence of the accused but is admissible only for the purpose of attacking the credibility of a government witness, the prosecution's failure to produce must be inherently significant and favorable to the defense in order to be 'unacceptably unfair.' *Cf. Link v. United States,* 352 F.2d 207 (8th Cir.), cert. denied, 383 U.S. 915, 86 S.Ct. 906, 15 L. Ed.2d 669 (1965). The salient inquiry is whether production of the requested information might have led the jury to entertain a reasonable doubt about the defendant's guilt. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Levin v. Clark* [133 U.S.App.D.C. 6], 408 F.2d 1209 (D.C. Cir. 1967). The nondisclosure must itself be prejudicial to the defense. *United States v. Brumley* (466 F.2d 911, 10 Cir.) *supra."*

However, in a recent decision the United States Supreme Court has somewhat restricted and clarified its holding in *Brady,* supra. See, *United States v. Agurs,* —— U.S. ——, 96 S.Ct. 2392, 49 L.Ed.2d 342, 19 Crim.Law Bull. 3159 (1976). In that case the Supreme Court reversed the holding of the Court of Appeals which had granted the defendant a new trial upon the ground that the prosecution had suppressed the criminal record of the person whom the defendant had killed and that such evidence reflected the violent nature of this person, which in turn supported the defense counsel's argument that the defendant had acted in self-defense. The Court of Appeals found such evidence was material and the jury might have returned a different verdict.·

The Supreme Court noted that the Brady doctrine arguably applies in "three quite different situations." *United States v. Agurs,* supra. The Court observed the first situation was that typified by *Mooney v. Holohan,* supra, where the prosecution's case includes perjured testimony of which the prosecution knew, or should have known existed.

The second situation the Court found was illustrated by the *Brady* case where a "pretrial request for specific evidence" is made and that evidence is found to be material. The Court noted the test of materiality in a case like *Brady,* in which specific information is requested, is not the same as in a case in which no request is made. And the Court essentially held that a general request, such as "all Brady. material" or "anything exculpatory" serves no better notice on the prosecution as if no request is made. Thus, the Court found "there is no significant difference between cases in which there has been merely a general request for exculpatory matter in cases, like the one we must now decide [*United States v. Agurs*], in which there has been no request at all." The constitutional duty to respond to a general request, or when no request is made, must emanate from the "obviously exculpatory character of certain evidence . . . [which] is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce . . ." *United States v. Agurs,* supra. Thus, the Court concluded that the third type of situation, as in the case before them, embraces the situation where a general request is made or the case where no request at all is made.

The Court opined the proper standard of materiality in the third type of situation to be a reflection of the Court's "overriding concern with the justice of the finding of guilt" and specifically that the question is "whether the omitted evidence created a reasonable *doubt that did not otherwise ex*ist."

Therefore, in the context of *Brady*, the first salient inquiry is whether or not there was a suppression by the State of information required to be produced under *Brady*, supra. See, *Grant v. Alldredge*, 498 F.2d 376 (2nd Cir. 1974). The record of the instant case in toto fails to persuade us that rebuttal witness Wise ever made a positive identification of Pelfrey as the unmasked robber of November 13, 1970. The affidavit of Ms. Fogley, although it must be given appropriate evidentiary weight, contravenes the more persuasive evidence in the case establishing that Pelfrey was not positively identified by Mr. Wise. The record of the instant case and the record of the preliminary hearing in the robbery charge filed against the defendant [6] establishes that the first photographic showing to Mr. Wise [7] following the robbery was apparently conducted by the Sheriff of McCurtain County, Huggins, and possibly was conducted in the presence of Dale according to Dale's testimony at the motion for a new trial hearing, however, Huggins could not recall Dale's presence at the time of the photographic exhibition to Mr. Wise following the robbery. Sheriff Huggins testified at the hearing on the motion for new trial and supplemental motion for new trial that Mr. Wise never made a positive identification of Pelfrey as the unmasked robber of November 23, 1970. Dale testified at the same hearing that he was present with Sheriff Huggins and Mr. Wise when the photographic exhibition was conducted about a month following the robbery and that Mr. Wise "picked out" Pelfrey as the unmasked robber. Dale testified at the preliminary hearing in the robbery case that Mr. Wise did not make a positive identification of Pelfrey, but Wise may have stated that Pelfrey looked more like one of the robbers than any of the other photographs he had seen, at this photo showing, but he could tell if he could see the individual in person. To add to the confusion and perplexity of the attendant circumstances of this case, Payne, the District Attorney at that time, testified at the motion for a new trial hearing that the preliminary information of the robbery case was filed against Pelfrey upon Wise's identification of Pelfrey as the robber. However, on cross-examination in the motion for new trial hearing, Payne testified he had no personal knowledge of this fact but such fact was communicated to him by Dale. Dale testified at the same hearing that the alleged identification by Wise was communicated to Payne by Sheriff Huggins. Huggins, of course, testified that Mr. Wise never did make a positive identification of Pelfrey. Also, Wise never testified that he made a positive identification of Pelfrey. Further, the attendees of the alleged photo showing in the spring of 1972 in no way corroborate Ms. Fogley's statement that Wise on that day identified Pelfrey as the robber he had previously identified from various photographs. The previous identification being referred to by Fogley was apparently the first photographic exhibition by Sheriff Huggins.

█ Therefore, we find that the disputed record in the instant case fails to support the contention that the prosecution suppressed any positive identification of Pelfrey by Wise which, if true, would at best serve to impeach Wise, thus indirectly impeaching the damaging testimony of the chief prosecution witness, Jenkins, in the trial of the instant case. Therefore, there has been no denial of the due process right to a fair trial in reference to any purported identification of Pelfrey by Wise as there was no suppression by the State. This conclusion obviates any consideration of the other elements of the Brady rule in reference to this purportedly suppressed information.

6. Again, we take judicial notice of the transcript of the proceedings in the preliminary hearing in the robbery case filed against the defendant under Rule 1.15 and *Renfro v. State*, supra. See, fn. 3.

7. The actual time of the photo showing is in dispute as is the place and the parties present.

We next consider the contention that the prosecution knowingly suppressed exculpatory evidence, particularly the allegation that Wise failed to identify McDonald from a photograph of McDonald included in the photographic exhibition shown to Wise in the spring of 1972. Again, we reiterate that the record in toto persuades us to conclude that a photographic showing to Wise did occur at that time and that one of the photos included McDonald.

Therefore, the appropriate inquiry is to determine the materiality of the evidence in question, and, whether or not this evidence creates a reasonable doubt that otherwise did not exist. See, *United States v. Agurs*, supra. In making this determination we observe the trial judge ruled upon this issue with a first hand appraisal of the credibility and demeanor of Jenkins who was an admitted murderer who anticipated receiving consideration by the prosecution regarding other crimes for which he stood charged for giving his testimony in the instant case. Wise never wavered in his identification of the defendant as the unmasked robber on November 13, 1970, following the positive identification of defendant in a lineup in Tulsa in February of 1973, which notably stands unchallenged as to its propriety. Further Wise identified defendant subsequently at trial in the instant case, and at the preliminary hearing in the robbery case. On the night of the robbery, Wise viewed the unmasked defendant on his front porch, which was illuminated by several 200 watt bulbs. Wise further testified at the preliminary hearing in the robbery case, which illustrates the impact of Wise's observations of the defendant on the night of the robbery, that, "They asked me if I thought I could identify them and I said, 'If I see him in person, I don't think I will ever forget him. I can identify him.'" (PH59).

■ Since this particular information in question was not specifically requested and does not constitute perjury, we find no reason to disturb the trial judge's ruling upon the issue as presented in the motion for new trial and supplemental motion for new trial. The evidence in question, in light of the entire record, fails to create a reasonable doubt that did not otherwise exist and thus we find the failure to disclose the evidence in question did not deprive the defendant of a fair trial as guaranteed by the due process clause of the Fifth Amendment made applicable to the states through the Fourteenth Amendment of the United States Constitution. For this reason we reject the defendant's second assignment of error.

For the above and foregoing reasons the defendant's second assignment of error is not persuasive.

Defendant argues his second assignment of error under his proposition number two which asserts:

"The trial court erred in not granting appellant's motion for mistrial because of prejudicial information made known to the jury from the inflammatory newspaper articles during the course of the trial."

This complaint especially concerns an article that appeared in the newspapers of the vicinity and in the Durant Democrat[8] on the afternoon of May 8, 1974. In addition, defendant offers other articles which appeared in other newspapers with statewide distribution recounting the same barn burning incident and certain other aspects of the evidence as it was developed at trial. More particularly, however, is the article which concerned two barns that were burned on the previous night, both of which belonged to Mr. Tom Gilbert. Mr. Gilbert had appeared as one of the prosecution witnesses and had also been called to testify as a defense witness. On the night of Mr. Gilbert's first day of testimony as a defense witness, the two barns caught fire and burned. The cause of the

---

8. Defendant had been granted a change of venue from Tulsa County District Court in Tulsa, Oklahoma, to the Bryan County District Court in Durant, Oklahoma.

fire was not readily determined. Insofar as the jury had not been sequestered, defendant contends that the members of the jury must have read the newspaper article and thereby become contaminated. Hence, defendant moved for a mistrial.

On the following morning when defense counsel brought the matter to the court's attention, it was agreed between the parties that the judge would call each juror into his chambers for the purpose of determining whether or not any of them had read the newspaper article in violation of the admonition given to the jury. It was also agreed that the court reporter would be present for the interrogation of the jurors. Thereupon, the trial judge proceeded to examine each juror concerning the newspaper article to determine if they had read the article; or, whether or not someone else had discussed the article with them; and if so, whether or not they should continue to sit as a member of the trial jury, or whether or not a mistrial should be declared. After interrogating the twelve regular jurors and one of the two alternate jurors, the judge concluded that none of them had read the newspaper article, and those with whom the article had been mentioned had not been prejudiced and that the trial should proceed. The second alternate juror had not reached the jury room in time to be interrogated. Later, he was the one person who made a sworn statement which was introduced at the hearing on the motion for a new trial. The statement asserted that the newspaper story had been discussed in the jury room. The trial court overruled defendant's motion for new trial as well as his supplemental motion for new trial. Now, on appeal defendant asserts that because of the newspaper article the jury was so prejudiced that he was denied a fair trial. We do not agree.

At the time the trial judge stated he would interrogate the jurors, defense counsel asked for and received permission to leave the judge's chambers. Consequently, the only two persons present with the individual jurors were the judge and his court reporter. At the conclusion of the interrogation, the court concluded that none of the jurors had been so contaminated as to cause a mistrial. Six of the regular jurors and one of the alternate jurors had not read the barn burning article. Of the others, the article had been mentioned to them and Loretta Brockett said her husband read the article and mentioned it to her, but she informed the judge that she had a mind of her own, thereby implying that she was not affected by the story. All of those to whom the article was mentioned stated that the information would not effect their judgment of the facts. The one outstanding fact is that none of the jurors had read the article. One juror to whom the article had been mentioned related that she could not see what bearing it had on the trial at hand.

As we view this proposition, insofar as the case had not yet been submitted to the jury, the burden is on the defendant to show prejudice. *Tapedo v. State*, 34 Okl.Cr. 165, 245 P. 897 (1926). "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial." *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). In *Glasgow v. State*, Okl.Cr., 370 P.2d 933 (1962), this Court provided an extensive review of the instant question. As we compare *Glasgow* with the instant case, *Glasgow* was even stronger than the instant case; but, nonetheless, this Court held that sufficient prejudice had not been shown to warrant the declaring of a mistrial. *Glasgow* differs from the instant case in that the newspaper incident was not called to the trial court's attention until after the verdict was rendered. Such was not true in this case. See also, *Wilson v. State*, Okl.Cr., 458 P.2d 315 (1969). We therefore conclude that the trial court did not commit error when the motion for new trial and the supplemental motion for new trial were overruled. Likewise, we believe defendant has

not shown this Court sufficient prejudice to warrant a reversal of this conviction for the reasons stated, nor do we believe this prevented defendant from receiving a fair trial.

■ The defendant's third assignment of error asserts:

"The prosecutors were guilty of improper conduct which prejudiced the rights of the appellant."

This claim is predicated on two propositions. The first proposition regarding the defendant's complaint concerns the prosecutor's closing argument. The defendant contends that the prosecution made prejudicial and improper comment at the outset of the State's closing argument. Particular comments of which the defendant now complains are reflected in the transcript of the trial proceedings as follows:

"And you know, it's not an easy thing to do, to put somebody in the penitentiary for the commission of a crime. We have the burden of proving any of them's guilt, beyond a reasonable doubt. And it's not an easy thing to do, and I guess, under our system, that's the way it should be. But you know, we had a grand jury, back in 1970, that commented a little bit on that. And I would like to read some of that to you. It's only about two sentences worth. This is a defense exhibit, by the way, and you can read it, yourself.

"That grand jury stated, back on the— latter part of September, or the first two or three days of October, 1970, when they wrote this report—it has a filing date of October 2nd, 1970. They stated that, 'it's apparent from testimony received by the grand jury, that there is a side of life in and near the City of Tulsa, that most citizens are unaware that exists.'

"And they stated, in a second sentence, 'we are concerned with the fact that law

enforcement is hampered with technicalities and undue restraints, as well as the philosophy of leniency towards persons accused and convicted of major crimes.'

"BY MR. SELLERS: Excuse me, your Honor. We object to this as improper argument on the part of the State.

"BY MR. SHAFFER: It's the defendant's exhibit, your Honor.

"BY THE COURT: Isn't it a defense exhibit?

"BY MR. SHAFFER: Yes, your Honor, it is.

"BY MR. SELLERS: Yes, sir. But,—

"BY THE COURT: (Interrupting) Sir?

"BY MR. SELLERS: It's the thrust of the arment, is what I am talking about.

"BY THE COURT: The objection will be overruled." (Tr. 1654–1656)

We find no erroneous statement of the law in these comments. The prosecution made reference to the burden of proof which the prosecution must meet. The jury had already been made aware of that burden in the court's instructions previously read to them. Furthermore, the grand jury statement had been previously admitted into evidence as a defense exhibit. Lastly, after the objection by defense counsel, to the "thrust" of the argument of the prosecutor, the prosecution did not reiterate or pursue the matter but proceeded to other matters. We fail to conceive how the defendant was prejudiced by these comments. See, *Klinekole v. State*, Okl.Cr., 456 P.2d 623 (1969) and *Montgomery v. State*, Okl.Cr., 447 P. 2d 469 (1968).

The defendant next complains of a prosecutorial comment which the defendant construes to be a comment upon the defendant's failure to testify and, thus, violates the statutory proscription set forth in 22 O.S. 1971, § 701.[9] The particular pros-

---

9. Title 22 O.S.1971, § 701, reads as follows: "In the trial of all indictments, informations, complaints and other proceedings against persons charged with the commission of a crime, offense or misdemeanor before any court or committing magistrate in this State,

**184**

ecutorial comment is reflected in the transcript of the trial proceedings as follows:

"In the Instructions of the Court, here, something, I think, needs to be pointed out, very carefully. And by the way, Counsel asked you, 'has anybody here said that they saw my client,' you know, 'help in this murder?' Huh uh. No. We didn't—we came to you with the evidence we had. We didn't fabricate evidence.

"Now, but you know, has there been anybody here who has said that Albert didn't say these things?

"BY MR. SELLERS: If your Honor please—

"BY MR. FALLIS: (Interrupting) Ladies and gentlemen—

"BY MR. SELLERS: (Interrupting) Just a minute. May we approach the bench?

"BY THE COURT: Yes, sir.

"(And thereupon, the Reporter joined counsel at the bench, where the following record was made, out of the hearing of the jury, to-wit:)

"BY MR. MOORE: If your Honor please, we object to the last argument of counsel. There has been definite and dual contradictions, and denials, by witnesses called by by the defendant, as to what Mr. McDonald said in this case. And the comment just made by counsel, is a direct reference, to this jury, that the defendant did not testify in his own behalf, and we move for a mistrial.

"BY THE COURT: It will be overruled, and exceptions allowed. . . ." (Tr. 1697–1698)

In *Pugh v. State,* Okl.Cr., 528 P.2d 719 (1974), this Court in considering a similar contention observed the general rule as enunciated in *Denney v. State,* Okl.Cr., 346 P.2d 359 (1959), in the second paragraph of the Syllabus, as follows:

the person charged shall at his own request, but not otherwise, be a competent witness, and his failure to make such request shall not create any presumption against him nor

"The Oklahoma statute prohibiting comment on failure of defendant to testify is comprehensive in the extreme and the Court of Criminal Appeals will not enlarge nor extend its provisions so as to prevent a fair discussion of the evidence, even though the defendant did not testify and called no witnesses in her behalf.

This statute will not be deemed to go to the extent of prohibiting comment upon inferences reasonably to be drawn from a failure to controvert the State's evidence by proper proof other than that which might be given by the defendant personally."

We also note that the alleged making of such statements by the defendant was contradicted by defense witnesses and thus we are in a quandary as to the proper inferences to be drawn from these comments. Therefore, we cannot conclude that such comments were more clear to the jury than to this Court, and certainly such comments could not have been a direct and unequivocal comment upon the defendant's failure to testify.

The defendant next complains of a particular prosecutorial comment which is reflected in the transcript of the trial proceedings as follows:

"They have done all that. Only you can erect that sign. And it says, 'stop. Stop. We are tired of it. No more killing of grand jury witnesses. No more bombing of judges.'

"BY MR. SELLERS: If your Honor please—

"BY MR. FALLIS: (Interrupting) And as far as this case in the adjoining county is concerned—

"BY MR. SELLERS: (Interrupting) Just a minute. Just a minute, Mr. Fallis. "Come up, Jack, would you please.

"We object to this argument, your Honor, as inflammatory and prejudicial—

be mentioned on the trial; if commented upon by counsel it shall be ground for a new trial."

"BY THE COURT: (Interrupting) Just a minute. Don't make your argument until the Reporter gets up here, to take it down.

"(And thereupon, the Reporter joined counsel at the bench, where the following record was made, out of the hearing of the jury, to-wit:)

"BY MR. SELLERS: We object to this argument, your Honor, as improper, and inflammatory and prejudicial, and move the Court to declare a mistrial.

"BY THE COURT: Overruled, and exceptions allowed." (Tr. 1703–1704)

■ We first observe this Court's language in *Jones v. State*, Okl.Cr., 542 P.2d 1316 (1975), wherein the Court noted:

"The exception that proof of a separate offense is admissible to explain the motive or intent of the accused in the commission of the offense charged is as well established as the general rule itself. See, *Dare v. State*, Okl.Cr., 378 P.2d 339 (1963); *Doser v. State*, 88 Okl.Cr. 299, 203 P.2d 451 (1949), and *Smith v. State*, 83 Okl.Cr. 209, 175 P.2d 348 (1946). . . ." (at 1325)

Therefore, the evidence of the Nelson bombing was properly admitted into evidence at trial to establish the motive of the murder of Cleo Epps, and thus was a proper subject for closing argument. The evidence at trial further established that Cleo Epps testified before a grand jury investigating the Nelson bombing.

■ This Court has long observed the general rule as observed in the fourth paragraph of the Syllabus to *Bell v. State*, Okl.Cr., 381 P.2d 167 (1962), as follows:

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration and argumentation is wide. Counsel for both the state and the defendant have a right to discuss fully from their standpoint the evidence and the inferences and deductions aris-

ing from it. It is only when argument by counsel for the state is grossly improper and unwarranted upon some point which may have affected defendant's right that a reversal can be based on improper argument."

Only by speculative inference on this particular prosecutorial comment can this language be considered as a directive to the jury to stop future crimes. Thus, the comment cannot be considered grossly improper nor could it have affected defendant's right to a fair and impartial trial.

■ In the defendant's second proposition in support of this assignment of error it is asserted that the prosecution wilfully propounded prejudicial and improper questions of various witnesses.

This Court has held that a defendant may not complain of an error which he has invited or waived, either expressly or impliedly. See, *Radney v. State*, 36 Okl.Cr. 240, 253 P. 913 (1927), cited with approval in *Carson v. State*, Okl.Cr., 529 P.2d 499 (1974). A review of the record in the instant case reflects that the matters of which the defendant now complains were either objected to with objections sustained, raised in the first instance on appeal by the defendant, or admitted without objection or proper objection. See, *Carson v. State*, supra. Thus, such grounds are not properly preserved for appeal.

The defendant's fourth assignment of error asserts that the trial court erred in overruling the motions of the defendant for a directed verdict. The defendant contends that the chief prosecution witness, Jenkins, testimony of the defendant's extrajudicial confession was essentially testimony of an accomplice under Oklahoma law, citing 22 O.S.1971, § 742.[10] Thus, such testimony had to be corroborated. The defendant asserts the testimony was not corroborated and the motion for defendant's directed verdict should have been granted, citing *Billey v. State*, Okl.Cr., 381

---

10. Title 22 O.S.1971, § 742, reads as follows: "A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

P.2d 160 (1963). Also see, *Brown v. State*, Okl.Cr., 518 P.2d 898 (1974).

■ The State correctly argues that Jenkins was not an accomplice under Oklahoma law and thus corroboration of his testimony was not necessary, citing *Wallis v. State*, 49 Okl.Cr. 58, 292 P, 1056 (1930); *Vann v. State*, 21 Okl.Cr. 298, 207 P. 102 (1922); *Edmondson v. State*, Okl.Cr., 515 P.2d 1158 (1973); and, *Rose v. State*, Okl.Cr., 509 P.2d 1368 (1973).

■ The State further correctly states that the body of law cited by defendant in support of the contention that the defendant's extrajudicial confession needed corroboration relates to proof of corpus delicti. Thus, the corpus delicti was independently proved in the instant case and Jenkins testimony connected defendant with the crime. Therefore, a review of the record reveals sufficient competent evidence from which the jury could reasonably conclude that the defendant was guilty as charged, and this Court will not invade the province of the trier of fact. See, *Jones v. State*, Okl.Cr., 468 P.2d 805 (1970).

The defendant's fifth assignment of error asserts:

"Appellant was denied his constitutional right to a speedy trial on the merits."

This Court has heretofore been presented with this issue in *In the Matter of Habeas Corpus of Albert McDonald*, (H–73–290, 1973), and we find no reason to reconsider this issue.

The defendant's final assignment of error asserts:

"Appellant asserts the courts of the State of Oklahoma are without jurisdiction of this charge."

Again, we note this issue was previously ruled upon in *In the Matter of Habeas Corpus of Albert McDonald*, supra, and we again find no reason to reconsider this issue.

For all the above and foregoing reasons, judgment and sentence appealed from is, accordingly, *AFFIRMED*.

BRETT, P. J., and BUSSEY, J., concur.